Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/11/2021 09:10 AM CDT

Heather Wright, appellee, v.
Lucas Wright, appellant.

___ N.W.2d ___

Filed April 27, 2021.    No. A-20-443.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
3. **Visitation: Appeal and Error.** Parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.
4. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.
5. **Visitation.** If a parent has been found to have committed child abuse or neglect, committed domestic intimate partner abuse, or interfered persistently with the other parent's access to the child, limits shall be imposed within the parenting plan that are reasonably calculated to protect the child or child's parent from harm.
6. **Divorce: Property Division.** In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties.

7. **Property Division.** Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties.

8. **Divorce: Property Division: Proof.** In a marital dissolution proceeding, the burden of proof rests with the party claiming that property is nonmarital.

9. **Divorce: Property Division.** Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance.

10. **Property Division.** Marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties.

11. **Divorce: Attorney Fees.** In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

Appeal from the District Court for Douglas County: Leigh Ann Retelsdorf, Judge. Affirmed.

Liam K. Meehan, of Wagner, Meehan & Watson, L.L.P., for appellant.

Justin A. Quinn for appellee.

Moore, Riedmann, and Bishop, Judges.

Bishop, Judge.

## INTRODUCTION

Lucas Wright appeals the amended decree entered by the Douglas County District Court dissolving his marriage to Heather Wright. He claims errors related to the parenting plan, premarital personal property, nonmarital gifts, student loans, and the court's award of attorney fees to Heather. We affirm.

## BACKGROUND

Heather and Lucas were married on September 15, 2012; prior to filing for divorce, they had "lived as a family unit" for "approximately ten years." They had two sons, one born in 2008 and another in 2009.

Heather filed a complaint for dissolution on April 4, 2018. Following an incident between herself and Lucas on May 1, Heather petitioned for and was granted a domestic abuse protection order on May 2 that gave Heather temporary custody of the children for 90 days and prohibited contact between Heather and Lucas. She then motioned the district court to enter a temporary order granting her sole legal and physical custody of the children, providing temporary child support, and directing the allocation of certain property and debts between herself and Lucas. Heather further filed an amended complaint on June 21, seeking sole legal and physical custody of the children.

On August 2, 2018, the district court entered a temporary order awarding Heather and Lucas joint legal and physical custody of their children, with a "week on/week off schedule." Each party was restrained from making disparaging comments regarding the other party to the minor children or in their presence, as well as directed to exercise diligence in preventing third parties from doing the same. The order also required Lucas to pay $409 per month in child support and addressed how the parties were to handle certain expenses, assets, and debts.

Trial began on February 28, 2019, and numerous hearings were held in the months thereafter, with an initial "Decree of Dissolution" entered on December 30. Notably, after the parties each presented their case in chief in trial proceedings held on April 3 and 11, the district court addressed the parties on the record at the conclusion of the proceedings on April 11. It noted that there was "no doubt" both parties love their children, but that Heather knew "how to get under [Lucas'] skin" and Lucas had "some anger" and was not controlling

that very well. And while Heather admitted that mistakes happen and she was not perfect, Lucas, on the other hand, did not understand that what he was doing was hurting the children. The court pointed out that Lucas was talking to the children about Heather and that he was saying things he should not be saying to them. The court stated:

> They do not need to be involved in the protection order business. They do not need to be involved in what her allegations are against you. They did not need to take a Valentine's Day present [from Lucas to Heather] when there was a protection order and put it on her pillow [for Lucas].

The court criticized both parents for videotaping the children with the other parent; "[t]hat is horrible to do to those children." The court told Lucas how things he was saying to the children "messes them up" and "makes them feel like they have to pick sides, and you can imagine what that does to them." The court expressed concern that Lucas was not thinking of the children first, but was instead focused on his anger toward Heather. The court stated:

> What I would like to do because . . . I entered a protection order and you ignored it. I — and don't say you didn't. I mean, you didn't hurt her, but you did stuff, you ignored it, because you're upset at her. I get all of that. But I entered that order and you ignored that. We had some issues with the temporary order that weren't followed.
>
> I . . . don't want to enter a final order today that puts you behind the eight ball for a long period of time. I want to give you the opportunity to show that you understand what that is doing to those absolutely wonderful little guys.
>
> . . . I'm going to modify the temporary [order] and I'm going to make your visitation less right now for a period — now, I have the option of doing something quite a bit more rigorous, but I don't want to do that right now because I want you . . . to put this in a situation where

this can be fixed. You know, some judges would just rule from the bench that that behavior is alienation. I don't want to do that. I want to give you an opportunity to show me that you get how to fix this.

I also think that that gives you an opportunity to heal because you need to get over your anger at [Heather].

The district court proceeded to verbally modify the temporary order to give Lucas parenting time every other weekend from Friday after school until Monday morning when school started, as well as after school until 9 p.m. on Wednesdays. The court also temporarily awarded Heather legal and physical custody. The court was going to leave the record open for 60 days, and the modified temporary order was to be in effect during that time. Dr. Glenda Cottam was to be "significantly involved"; family therapy was ordered. The parties were to have no contact with one another. The court informed Lucas that it wanted him "to get a good understanding of what these behaviors have done to these boys. They should not be mad at their mom. Do you understand what I'm saying? They shouldn't be mad at her for this divorce."

The district court provided this 60-day period for Lucas to correct his behaviors, informing him that it was avoiding entering a final order at that time so the parties could "get to a point where [they] can parallel-parent" and Lucas could recognize that "the best way to be a good dad is to encourage his children . . . to love their mom . . . no matter how he feels." The court told Lucas that the children were "not in a healthy situation because they're angry at [Heather] and they're angry because of the things you have said to them, and you can deny it if you want, but I have talked to them." The children "know you're hurt," and "they're mad at [Heather] because you're hurt. What a horrible thing for those kids to feel. They shouldn't be mad at their mom because she loves them. They shouldn't even know that you're mad at their mom." A second temporary order consistent with the court's verbal directives was entered on April 29, 2019.

Following a contempt hearing on July 3, 2019, the district court entered a third temporary order on July 11. The court found that Lucas violated the August 2018 temporary order by sending a series of text messages to the minor children that included disparaging comments about their mother, which messages "were an effort to manipulate the minor children." The court also found that Lucas violated the April 2019 temporary order by failing to return the children in accordance with the court-ordered parenting schedule. Lucas was sentenced to 5 days in jail, but the sentence was suspended, and Lucas was given the ability to purge his contempt by "complying with all parts of the further temporary order regarding parenting time entered contemporaneously with this Order." The third temporary order restricted Lucas' communication with the children and suspended his parenting time except for court-ordered therapeutic parenting time. Lucas was to have no communication whatsoever with the children outside of his therapeutic parenting time.

The district court entered a fourth temporary order on September 16, 2019, increasing Lucas' temporary child support obligation to $1,419 per month and dividing certain expenditures between Heather and Lucas.

On December 30, 2019, the district court entered a decree dissolving the parties' marriage. The court later entered an amended decree on May 18, 2020, addressing issues regarding the child support calculation raised in Lucas' motion for new trial. The court found it to be in the children's best interests to grant Heather their sole legal and physical custody subject to Lucas' therapeutic and supervised parenting time. The amended decree noted that Lucas had been convicted of three separate misdemeanor crimes involving Heather as a victim during the pendency of the case. These included a May 2018 incident when Lucas threatened and choked Heather, resulting in a disturbing the peace conviction, and various violations of protection orders in 2018 and 2019. Lucas was sentenced to 24 months' probation beginning in October 2019 for his

convictions for violating a protection order and stalking, and Lucas was ordered to have no contact with Heather.

The amended decree detailed the district court's concerns about Lucas' manipulation of the children, which included an instance when Lucas had the children assist him "in the criminal act of violation of the protection order," referencing when Lucas had the children place a Valentine and a "mixed tape [CD song mix]" on Heather's bedroom pillow. The court also mentioned incidents when Lucas followed and stalked Heather, "ending up at places [Heather] had gone when she was with other men friends and co-workers." The court also pointed out an incident when Lucas showed up at a football equipment meeting even though Lucas was not supposed to be there, but Lucas asked his oldest son, "'I have a right to be here, don't I [son]?'" The video of the incident showed that the oldest son was "extremely uncomfortable and anxious due to [Lucas'] behaviors." The amended decree stated, "The record shows [Lucas] has little regard for court orders, including discovery orders, temporary orders, and the protection order." The amended decree further provided:

> The Court finds [Lucas] has repeatedly engaged in behaviors which cause "alienation between the children and their mother." This finding is supported by Dr. Cottam. [Lucas] denies any manipulation of the children or use of the children, particularly [the oldest son], to maintain control over [Heather]. The Court finds he appears to have no insight into how his desire to control or punish [Heather] hurts his children. This pattern of behavior, according to Dr. Cottam, has a significant effect on the minor children, causing them confusion, sadness and anxiety.
>
> The evidence before the Court shows that [Lucas] has engaged in a pattern of discussing his criminal matters with the children and placing blame on [Heather], telling the children their mother was having him arrested, discussing the protection order issued against him and

blaming [Heather], referring to her as a liar, and telling the children to tell their mother what to do and how to do it, criticizing [Heather] to the children, and directing the children to [Heather's] private/dating life by speaking to them about it or directing them to social media. The Court interviewed the children, [the oldest son] on two occasions and [the youngest son] on a single occasion. Although those interviews are sealed, they corroborate Dr. Cottam's opinions and the Court[']s findings. Dr. Cottam remains concerned about [Lucas] making "statements that could arise to the level of emotional abuse or confusion for the children."

Dr. Cottam recognized that [Lucas'] attempt to communicate through the children causes undue stress. [Lucas] shares his sadness, emotional instability, and desire to reunite, even to the extent of praying with the children that the parents will reunite. The Court finds [Lucas] has placed the children in a position where they assume the responsibility to mend the relationship or blame one parent for the failure of the marriage. [Lucas] continues to tell the children that their mother poorly cares for them, reminds the children of past issues, and shares legal difficulties in an apparent attempt to ensure their loyalty and posture against their mother.

[Lucas] both overtly and covertly attempts to promote anger by the children towards their mother. [Lucas] directly encouraged [the oldest son] to gather evidence to use against their mother, telling him to videotape ants in the home and tell police he is scared. . . .

[Lucas] has used the children by withholding them from [Heather's] father, who was to pick up the children at the end of [Lucas'] parenting time. [Lucas] harassed and badgered [Heather's] father, continuing to withhold the children over a period of several days in an attempt to obtain information as to Heather's location and return time. These acts were in direct violation of

the temporary orders. Again, [Lucas] appears to have no insight and continues to justify these types of behaviors by attempting to deflect all blame away from himself.

Dr. Cottam testified . . . that the minor children . . . made a number of statements which appeared to have been influenced by an adult [and] that the statements, and wording . . . were not consistent with a child of [the oldest son's] age and development. . . .

. . . .

The Court has continued this matter and attempted to involve experts in the hope that [Lucas] can gain insight into the effect of these strategies and behaviors. However, the testimony of Dr. Cottam suggests that [Lucas] has not yet been able to gain that insight or separate from the divorce conflict which continues to negatively affect the minor children.

. . . Dr. Cottam testified that both children love their parents and the parents love the children. The children want to spend time with their father and have him in their lives.

The amended decree pointed out Dr. Cottam's concerns that "she has been working with the family for over 100 days" and that she has "not seen [Lucas] exhibit sufficient improvement" to recommend unsupervised parenting time with the children. Dr. Cottam "believes that supervised visitation should continue for [Lucas]." The district court further stated:

[B]ased upon the evidence before the Court, at this time, the Court cannot speculate as to when [Lucas] will take the steps necessary to adjust his behaviors to allow for unsupervised visitation to be in the children's best interests. At this time, any plan with graduated suspension of supervised visitation is speculative and in reliance upon [Lucas'] completion of certain milestones that may or may not affect [Lucas'] behaviors. . . . The Court does find it to be in the best interests of the minor children to increase [Lucas'] supervised visitation, per Dr. Cottam's suggestion. The children want this contact with [Lucas].

Accordingly, the parenting plan attached to and incorporated into the amended decree provided:

> [Lucas] shall have therapeutic parenting time with Dr. . . . Cottam until the children have reached maximum therapeutic benefit and shall additionally have supervised parenting time each week. The supervised parenting time shall be through [C]apstone or such other professional supervising agency approved by [Heather]. The supervision shall be every Tuesday evening from 5:30 p.m. to 7:30 p.m. and every other Saturday from 3:00 p.m. to 5:00 p.m. The supervision shall be at [Lucas'] expense. [Lucas] shall have no communication or contact with the minor children other than during their Therapeutic Parenting Time and his Supervised Parenting Time. If the children have an activity or sporting event during the pre-arranged Supervised Parenting Time, [Lucas] may attend while being supervised. However, [Lucas] is still under order of the Douglas County Court to have no contact with [Heather], pursuant to his order of probation and shall have no contact with [Heather] during these activities.

The parenting plan did not include any specific holiday or vacation schedule for Lucas' parenting time, but it did indicate that Lucas "may have supervised Holiday time during his regular Supervised Parenting Time, if it can be arranged with the supervising agency." The parenting plan further provides that "[t]he terms concerning parenting time and access to the children may be adjusted or temporarily modified in length, timing or terms upon reasonable advance notice, communication and agreement between [Heather] and [Lucas]." Any permanent changes could be made by agreement of the parties but "must be approved by the Court to be binding and enforceable."

The amended decree also required Lucas to pay $960 per month in child support for two children. The district court divided expenses pertaining to the children and further

distributed marital and nonmarital property and debts between Heather and Lucas. The court ordered Heather to pay an equalization payment of $10,957.50 to Lucas and ordered Lucas to pay $13,000 of Heather's attorney fees within 365 days of the entry of the decree.

Lucas timely appealed.

## ASSIGNMENTS OF ERROR

Lucas claims the district court erred by (1) ordering supervised and therapeutic visitation for an indefinite duration, (2) failing to order the return of premarital property, (3) excluding credit for gifts made by Lucas' family during the marriage, (4) excluding student loan debt from the marital estate, and (5) awarding attorney fees.

## STANDARD OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Doerr v. Doerr*, 306 Neb. 350, 945 N.W.2d 137 (2020). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## ANALYSIS

### Therapeutic and Supervised Parenting Time

The district court ordered the implementation of the parenting plan as described above, which restricted Lucas' parenting time to scheduled instances of therapeutic parenting time and supervised parenting time. Based on the evidence at trial, the court found the plan to be in the best interests of the minor children. In making this finding, the court highlighted two issues that predominated the proceedings. The first was

the pattern of domestic conflict between Heather and Lucas occurring prior to and during this case, which was marked by three misdemeanor crimes committed by Lucas against Heather after she filed her petition. The second, as the district court described in the amended decree, was a pattern of "behaviors which cause[d] 'alienation between the children and their mother'" by "overtly and covertly attempt[ing] to promote anger by the children towards their mother" and by "plac[ing] the children in a position where they assume the responsibility to mend the relationship or blame one parent for the failure of the marriage."

We understand Lucas' argument on appeal to primarily challenge the propriety of the district court's parenting plan restricting his parenting time to therapeutic and supervised instances. Lucas asserts that "[t]he restrictions ordered by the court were too expansive when applying Neb. Rev. Stat. §43-2932 . . . ." Brief for appellant at 21. He claims the court's limitations on his parenting time could not be reasonably calculated to protect the children because "[t]he record was clear that the children were not in physical danger with Lucas . . . ." Id. at 24. Lucas also argues the district court erred "in not thoroughly weighing the standard best interest factors" when setting Lucas' parenting time. Id. at 25. In support of his arguments, he points to Dr. Cottam's testimony indicating "the children were not in physical danger with [him]" or "testing on a depression or anxiety scale," and he further highlights the children's expressed desire "to see their father." Id. at 24. Contrasting his role as the children's father with Heather's as their mother, Lucas emphasizes the complaints raised by the children about the condition of Heather's home and that "the only allegation of actual physical harm occurring to a child came against [Heather]." Id. at 26.

[3,4] Parenting time determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

*Bornhorst v. Bornhorst*, 28 Neb. App. 182, 941 N.W.2d 769 (2020). When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

[5] When a court is required to develop a parenting plan, Neb. Rev. Stat. § 43-2932(1) (Reissue 2016) permits limitations to parenting time or other access for a parent if the preponderance of the evidence demonstrates the parent has, among other things, "committed child abuse or neglect," committed "domestic intimate partner abuse," or "interfered persistently with the other parent's access to the child." If a parent is found to have engaged in such activity, "limits shall be imposed that are reasonably calculated to protect the child or child's parent from harm." *Id*. Further, the limitations permitted by § 43-2932 include, but are not limited to, "allocation of sole legal or physical custody to one parent"; "[s]upervision of the parenting time, visitation, or other access between a parent and the child"; "[e]xchange of the child between parents through an intermediary or in a protected setting"; "[r]estraints on the parent from communication with or proximity to the other parent or the child"; "[d]enial of overnight physical custodial parenting time"; and "[a]ny other constraints or conditions deemed necessary to provide for the safety of the child, a child's parent, or any person whose safety immediately affects the child's welfare." See, also, *Fine v. Fine*, 261 Neb. 836, 626 N.W.2d 526 (2001) (although limits on visitation are extreme measure, they may be warranted where they are in best interests of children; supervised visitation for mother required until she can make satisfactory showing she is able to provide safe and stable environment for unsupervised visitation with her children consistent with their best interests).

Notwithstanding the record's substantial evidence concerning the incidents of domestic conflict between Heather and Lucas, Lucas emphasizes the lack of evidence that he posed

a risk of physical harm to the children as the core of his argument against the parenting plan. However, physical harm is not the sole form of harm that may be posed to a child. The district court described, at significant length and detail, the nature and extent of Lucas' involvement of the children in the conflict between Heather and himself, which we set forth previously. Lucas engaged in a pattern of discussing his criminal matters with the children and placing blame on Heather, telling the children their mother was having him arrested, discussing the protection order issued against him and blaming Heather, referring to her as a liar, telling the children to tell their mother what to do and how to do it, criticizing Heather to the children, and directing the children to Heather's private/dating life by speaking to them about it or directing them to social media.

The district court further described circumstances where Lucas interfered with transitions between the parties' parenting times or otherwise injected the children directly into incidents between Heather and himself to harmful effect. Dr. Cottam, noting the tests for depression and anxiety she administered to the children were not always reliable, believed Lucas' behaviors have had significant negative effects on the children's mental and emotional well-being that manifested in the children as anxiety, stress, confusion, and sadness. It is evident the court believed therapeutic and supervised parenting time to be in the children's best interests and necessary to their healing and development through this contentious period. It is also plain the court believed this arrangement necessary to better foster Lucas' positive role as the children's father going into the future. Given the record underlying the district court's findings, we cannot say limiting Lucas' interactions with the children to therapeutic and supervised parenting time at the time of the decree constituted an abuse of discretion.

Lucas contends the district court abused its discretion because it did not provide a "step down" from the supervised parenting time and because "[l]ess restrictive alternatives

exist[],'" such as ordering supervised parenting time for 90 days or less or "until more of the criminal probation order had been complied with." Brief for appellant at 24. However, the district court noted in its May 18, 2020, amended decree that "any plan with graduated suspension of supervised visitation is speculative and in reliance upon [Lucas'] completion of certain milestones that may or may not affect [his] behaviors" and that it could not "speculate as to when [Lucas] will take the steps necessary to adjust his behaviors to allow for unsupervised visitation to be in the children's best interests."

Given the lack of progress made by Lucas following the April 11, 2019, proceeding, it is not surprising the district court was unwilling to place a speculative deadline on the therapeutic and supervised parenting time. A year earlier, at the conclusion of that April 11 hearing, the district court specifically admonished Lucas about how things he was saying to the children "messes them up" and "makes them feel like they have to pick sides," and the district court stated that some judges "would just rule from the bench that [this] behavior is alienation." That said, the court was willing to delay entering a final decree in order to give Lucas an opportunity to correct those behaviors. Despite that opportunity to show improvement, Lucas elected instead to engage in further parental alienation behaviors which adversely impacted the children. As noted by the district court in the amended decree, Lucas continued to have "little regard for court orders." Unfortunately, Lucas continued to fail to recognize how his behavior and improper influence on his children was detrimental to their emotional well-being. Additionally, when the court was contemplating whether 90 days would be sufficient for Lucas "to gain insight," the court asked Dr. Cottam whether she had seen Lucas make the progress she "had hoped for" in the past 100 days; Dr. Cottam responded, "No." Further, even in Dr. Cottam's presence as a supervisor over Lucas' parenting time, she observed Lucas over those 100 days to continue to make statements with a "derogatory implication to [Heather]."

Based upon the evidence in the record before us, we cannot say the district court abused its discretion by ordering therapeutic and supervised parenting time. The ability to transition to unsupervised parenting time is in Lucas' control. He simply needs to demonstrate that he will no longer engage in manipulative or alienating behavior which adversely impacts the children's relationship with their mother. This will require Lucas to move past his emotional distress, anger, and/or resentment toward Heather over the deterioration of their relationship, and it will require Lucas to instead focus on being a good father to his sons. The evidence reflects Lucas loves his sons and is fully capable of being such a father. Upon proper evidence presented to the court, the current parenting plan is subject to modification. See *State on behalf of Maddox S. v. Matthew E.*, 23 Neb. App. 500, 873 N.W.2d 208 (2016) (right of parenting time is subject to continuous review by court, and party may seek modification of parenting time order on grounds there has been material change in circumstances; best interests of children are primary and paramount considerations in determining and modifying parenting time).

## Premarital Property

Lucas argues the district court abused its discretion in not awarding him certain property he claimed to be nonmarital. The court awarded Heather and Lucas "the personal property currently in their possession." The court additionally awarded Lucas "any tools listed on Exhibit 103 that remain in [Heather's] possession[,] . . . his mother's hutch and china, his golf clubs, . . . a set of knives belonging to [his] father," and "any items noted on Exhibit 114, which were marked with an 'L' by [Heather]." Exhibit 103 is a list of specific tools, which exhibit was offered by Lucas as an aid to the district court. Exhibit 114 is a spreadsheet offered as an aid setting forth a division of property between Heather and Lucas. Except for the gifts of $3,000 made to Heather by each of her parents, the district court determined that "[n]either [Heather] nor [Lucas] met their burden as to any other property claimed

to be non-marital." The court further ordered Heather to pay Lucas an equalization payment of $10,957.50.

Lucas asserts the district court abused its discretion in not awarding him all the property he listed as nonmarital in exhibit 101. Exhibit 101 is an inventory offered by Lucas in which he designated certain property as marital or nonmarital. Lucas argues the district court erred by "only provid[ing] a division of joint marital property and a few limited pieces of family heirlooms" while "not properly identifying the non-marital property of Lucas." Brief for appellant at 28. Lucas also identifies that when responding to the question of whether Heather and Lucas had "divided [their] personal property as much as [they were] going to," Heather testified that if "[t]here [were] still items that [Lucas] would like to retrieve, he can have, absolutely."

[6-8] In a divorce action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016). Equitable property division under Neb. Rev. Stat. § 42-365 (Reissue 2016) is a three-step process. *Stanosheck v. Jeanette, supra*. The first step is to classify the parties' property as marital or nonmarital. *Id.* The second step is to value the marital assets and marital liabilities of the parties. *Id.* The third step is to calculate and divide the net marital estate between the parties. *Id.* In a marital dissolution proceeding, the burden of proof rests with the party claiming that property is nonmarital. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). The division of property is a matter entrusted to the discretion of the trial judge, which will be reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion. *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003). When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

In this circumstance, we give weight to the fact that the trial judge heard and observed the witnesses on this matter. The district court took the parties' exhibits and testimony into consideration and made determinations as to the credibility and weight that evidence should be given in its decree. While we note the record before us could have supported the court's award to Lucas of the items listed in exhibit 101, we cannot say the court abused its discretion in finding that Lucas had not carried his burden to prove this property to be nonmarital. That said, to the extent the items alleged by Lucas in exhibit 101 are known by Heather to have belonged to Lucas prior to their marriage, and there is no disagreement whatsoever as to their premarital status, it would certainly be reasonable for Heather to return such items to Lucas given her testimony generally indicating her willingness for Lucas to "absolutely" have his personal property.

## Payments From Lucas' Mother

Lucas claims the district court abused its discretion in not awarding him credit for certain payments received from his mother during the marriage. Lucas claims two amounts given by his mother should have been credited to him as nonmarital. At trial, he testified his "mother transferred $1,000" into the parties' joint account for Heather, the children, and himself "to go to Arizona for a Christmas vacation" in 2014. Also, Lucas' mother affirmed that she "made contributions to a car payment for a period of . . . years" that "totaled in excess of $6,000." She also agreed that she had helped Heather and Lucas "with other money during their marriage." As noted previously, the district court found that outside of items specifically characterized in its decree as nonmarital, "[n]either [Heather] nor [Lucas] met their burden as to any other property claimed to be non-marital."

[9] The general rule in dissolution actions is that all property accumulated and acquired by either spouse during a marriage is part of the marital estate. See *Dooling v. Dooling*,

303 Neb. 494, 930 N.W.2d 481 (2019). Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.* In a marital dissolution proceeding, the burden of proof rests with the party claiming that property is nonmarital. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019).

We find no abuse of discretion by the district court on this issue. The record does not establish that the amounts alleged by Lucas and his mother were ever intended to be nonmarital gifts to Lucas. Lucas' mother paid $1,000 into the parties' joint account for the express purpose of funding the family's Christmas vacation to Arizona to visit her; its purpose was to help facilitate a family gathering beneficial to all involved. As for the alleged $6,000 paid through an unspecified number of "contributions to a car payment" at unspecified times over an unspecified "period of . . . years," there was simply no evidence that such payments were intended as nonmarital gifts to Lucas. Further, Heather affirmed during her testimony that these car payments were for "a car [Lucas] owned beforehand" that "has been sold" with the corresponding proceeds "dissipated." Notably, Lucas' mother affirmed that she had helped "them" with other money during the parties' marriage, and she had done so "on a regular basis." No evidence supported that any of these payments were made solely for Lucas' benefit outside the marital estate; rather, it appears from Lucas' mother's testimony that she was generous in helping the couple when they needed help. Lucas did not carry his burden of proving these amounts should be credited to him as nonmarital property.

## Student Loan Debt

Lucas returned to school for his master's degree in 2012 just before the parties' marriage, and he graduated in 2014. Lucas testified that he "took an additional $41,000 . . . to cover expenses" beyond the amount necessary to pay off his "tuition and schooling." He testified that the "additional $41,000"

was "deposited into [the parties'] joint account." In her deposition testimony, Heather affirmed that these amounts "went into the joint account where [the parties'] bills were paid." Neither party provided evidence of how that money was spent. According to bank records offered by Lucas, certain deposits attributed to the "STATE OF NE" were made into the parties' joint account beginning from August 22, 2012, until January 17, 2014. During that time period, a total of $40,622.80 was deposited into the joint account. A loan statement in the record indicated that as of July 9, 2019, the outstanding balance on Lucas' student loans was $124,157.14.

In its decree, the district court determined there was insufficient evidence "to determine an equitable amount to attribute as marital debt from the loans borrowed by [Lucas] to further his education." The court further noted that while it was "possible that a portion of [Lucas'] student loan debt was utilized for support of the family," there was "no evidence as to how much of the loan deposits . . . were used to pay for tuition, books[,] or other school expenses or to what extent the student loans used for support had been repaid with marital money between the time they were incurred and the time of separation."

Lucas asserts the district court abused its discretion by not including his student loans as marital debt, at least as to "$40,622.80 of non-tuition student loans" deposited into the parties' joint account. Brief for appellant at 29. Lucas asserts the district court erred through "misconstru[ing] how student loan deposits work and fail[ing] to incorporate facts proven by admitted exhibits." *Id.* at 30. He claims that the deposited amounts were not used to pay for tuition, as his tuition was paid through loan proceeds "sent directly to the school." *Id.* at 31. He further argues that the court erred in "suggest[ing] that the loan could have been repaid or paid down [when] Lucas has an outstanding balance . . . larger than the original principal amount." *Id.*

[10] Marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties.

*Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). As the parties discuss in their briefs on appeal, this court found in *Walker v. Walker*, 9 Neb. App. 694, 618 N.W.2d 465 (2000), that the district court did not abuse its discretion in finding student loan debt accrued during the marriage to be nonmarital where the parties disputed the extent to which the student loans were used for joint marital interests or the obligor's education. The record showed a student loan indebtedness of $63,800, which was approximately $20,000 in excess of the obligor's direct educational expenses. In that case, we noted the obligor took "with her all of the benefits of her law school education, and equity requires that she take with her those debts directly related to obtaining that degree." *Id.* at 700, 618 N.W.2d at 471. This holding demonstrates the importance of presenting a sufficient record that establishes the distribution and utilization of student loans incurred during the marriage.

Despite Lucas' assertion on appeal that certain amounts of his loan were directly paid to the school and that the entirety of the $40,622.80 was for joint marital benefit, we have before us neither any sort of itemization of the student loan proceeds nor records of tuition payments to the school or other educational costs that would identify whether or not the deposited amounts were in excess of such costs, thus making them available to use for joint marital expenses. The record does not contain any accounting for how the student loan proceeds deposited into the joint account were utilized during the marriage. Rather, the record before us shows only that $40,622.80 was deposited into the parties' joint account while Lucas was in school and that there remains an outstanding balance on Lucas' student loans. Lucas asserts that these facts, without further context, compel this court to attribute the $40,622.80 to the marital estate as a marital debt. In effect, Lucas asks this court to assume the $40,622.80 went to the joint benefit of the parties purely through its presence in the joint account. However, the evidence does not indicate whether the deposited proceeds went toward Lucas' education or support for the family while

he was in school. In the absence of further evidence and context regarding Lucas' student loans, we cannot say the district court abused its discretion in not attributing any amount of Lucas' student loan debt to the marital estate.

## ATTORNEY FEES

The district court ordered Lucas to pay $13,000 in attorney fees to Heather. Lucas claims the district court abused its discretion in awarding Heather attorney fees given the parties' similar earning capacities and the balance of equities in the case.

[11] It has been held that in awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions asked, and the customary charges of the bar for similar services. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). The award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. See *id*.

According to an affidavit for attorney fees received into evidence at the hearing held on October 16, 2019, Heather's attorney charged her at a rate of $210 per hour. Prior to the conclusion of trial, the affidavit indicated that Heather had incurred $25,483.97 in attorney fees and expenses. We have reviewed the record, and we conclude the district court did not abuse its discretion in ordering Lucas to pay $13,000 in attorney fees.

## CONCLUSION

For the reasons set forth above, we affirm the district court's amended decree in all respects.

AFFIRMED.