Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
11/03/2023 01:06 AM CDT

Juli Ann Radmanesh, appellee, v.
Kourosh C. Radmanesh, appellant.

___ N.W.2d ___

Filed October 27, 2023.    No. S-22-826.

1. **Divorce: Property Division: Alimony: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations of alimony and property division.
2. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.
3. ____: ____. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.
4. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
5. **Divorce: Property Division: Alimony.** In a dissolution of marriage proceeding, Neb. Rev. Stat. § 42-365 (Reissue 2016) allows a court to order payment of such alimony by one party to the other and division of property as may be reasonable.
6. **Property Division: Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. The purpose of property division is to distribute the marital assets equitably between the parties.
7. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the

same amount of alimony as the trial court did, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.

8. **Divorce: Alimony.** In weighing a request for alimony, the court may consider all the property owned by the parties when entering the decree, whether accumulated by their joint efforts or acquired by inheritance.

9. **Judgments: Appeal and Error.** As a general proposition, an appellate court does not require a district court to explain its reasoning.

10. **Alimony.** The primary purpose of alimony is to assist an ex-spouse for a reasonable period of time necessary for that individual to secure his or her own means of support. Ultimately, the duration of an alimony award must be reasonable.

11. ____. Alimony should not be used as a tool to equalize the parties' incomes or to punish one of the parties. However, a disparity of income or potential income might partially justify an alimony award.

12. **Divorce: Property Division: Equity.** The purpose of assigning a date of valuation in a dissolution decree is to ensure that the marital estate is equitably divided.

13. **Divorce: Property Division: Appeal and Error.** Generally, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate and the property being divided. The date of valuation is reviewed for an abuse of the trial court's discretion.

14. **Property Division.** Marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties. This is a flexible, fact-specific standard.

Appeal from the District Court for Sarpy County: STEFANIE A. MARTINEZ, Judge. Affirmed.

Liam K. Meehan, of Wagner, Meehan & Watson, L.L.P., for appellant.

April M. Lucas, Joy Kathurima, and Tracy Hightower-Henne, of Hightower Reff Law, L.L.C., for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, FUNKE, PAPIK, and FREUDENBERG, JJ.

Funke, J.

## I. INTRODUCTION

Husband appeals from a decree of dissolution, arguing that the district court for Sarpy County, Nebraska, erred in awarding wife alimony and an equalization payment and in equally dividing student loans for the parties' children. Finding no abuse of discretion, we affirm the decree.

## II. BACKGROUND

Kourosh C. Radmanesh (Cyrus) and Juli Ann Radmanesh were married in 1991. During the marriage, the parties had twin children born in April 2000. The parties separated in or around August 2018. In July 2021, Juli filed a complaint for dissolution of marriage. The parties' children had reached the age of majority by the time of the trial.

### 1. Trial

At the trial, Cyrus and Juli were the only witnesses. The testimony and evidence pertinent to the issues raised on appeal is summarized below. Additional facts will be introduced, where relevant, in our analysis of the parties' arguments on appeal.

### (a) Alimony

For the 4 years before the trial, Juli worked at a retail store, earning approximately $40,000 annually. She contributed to an employer-sponsored retirement plan while working in that position. Juli testified that her monthly expenses were approximately $4,000. Juli requested alimony of $1,000 per month for 5 years from Cyrus.

Juli testified that she inherited approximately $160,000 from her father's estate, mostly in stocks, after separating from Cyrus, but before the trial. She further testified that most of that inheritance was initially placed in a savings account, and the rest was placed in her checking account or used to pay expenses. The parties agreed that the funds in several of Juli's accounts were from her inheritance.

Cyrus testified that he was a consultant in the telecommunications industry and that he owned his own firm. He testified that he made between $10,000 and $140,000 per contract. He further testified that his income varied annually depending on the length and location of the contracts. For example, documentation admitted into evidence showed that Cyrus earned an average of $106,000 annually between 2009 and 2013, and an average of $20,000 annually between 2014 and 2018. Cyrus testified that for his most recent contract, from 2019 to 2021, he earned $143,000 to $145,000 annually. Cyrus testified that he had not worked since 2021 and that he was paying his bills with his savings. Cyrus further testified that he had bid for new contracts, but to no avail.

Juli, however, suggested that Cyrus was responsible for his unemployment. The district court admitted into evidence a copy of an email and text message sent from Cyrus to the parties' children. Therein, Cyrus stated that although his current contract was ending, he had been offered a full-time job, contingent on his being vaccinated for COVID-19. Cyrus stated that he was willing to get the vaccine "if Juli suspend[ed] the divorce case" until the children graduated from college. Cyrus stated that he had communicated this to Juli, along with other "incentive[s]" that she would receive if she suspended the divorce. Cyrus further stated that if Juli did not agree, he "will not get the COVID19 vaccine and after 12/31/21 he will be unemployed and [give] no support for the family in 2022 and beyond." According to Cyrus, Juli did not agree to his terms. Thereafter, Cyrus told his children he would be unable to provide for them because he was "volunteering" not to get the vaccine required for the job.

Cyrus also testified that he was 65 years old at the time of the trial and that he would like to work until he was 70 years old or older. He then confirmed that he intended to work for the next 5 years at least if he was able. He stated that once he retired, he would rely on Social Security benefits to pay his expenses, benefits which he expected to be approximately

$4,000 a month. Cyrus had not contributed to any retirement account, and evidence at the trial showed that his monthly expenses were estimated to be approximately $4,000. He also had other bills and miscellaneous expenses. Cyrus argued against any obligation for spousal support for Juli.

(b) Equalization Payment

Juli testified to her ownership and the value of multiple bank accounts, credit card accounts, and retirement accounts that were separate from an IRA holding her inherited funds. She also testified that she owned a vehicle. Juli requested that the district court divide all marital property equally. Juli also requested that the previously mentioned inheritance from her father's estate be deemed nonmarital property and not included in the valuation of the marital estate.

Cyrus agreed with Juli's classification of the inherited funds and did not request any of those funds nor Juli's retirement funds.

The district court admitted into evidence a marital estate distribution worksheet proposed by Juli. The proposed distribution listed the value of the parties' assets and debts. All the assets and debts for both parties were valued between July 4 and November 1, 2021.

Cyrus argued that Juli's proposed distribution of assets incorrectly valued his bank account. According to his testimony, as well as the proposed distribution and bank account statements, the account had a balance of $115,100 as of August 2021. However, Cyrus testified that by the time of the trial, the value of the account had depleted to approximately $52,000 because he had been unemployed and had used the account for expenses. Cyrus did not offer any documentary evidence to support his testimony that the account had been depleted since the divorce filing. Nor did he dispute any of the evidence or testimony presented by Juli about the value of the remainder of the parties' marital estate. The total value of the proposed marital estate, as set forth by Juli, was

$96,403.51, and her proposed distribution via equalization payment was $53,200.29.

#### (c) Student Loan Debt

The parties testified that their children were both attending college and expected to graduate in the spring of 2023. The children's college tuition was paid for by a combination of scholarships, grants, and federal student loans. The student loans were incurred in Juli's name. Neither party introduced any evidence documenting the details of the loans, but both testified about them.

Juli testified that she applied for the loans on behalf of the children and that she took out the loans in only her name because she was the one who helped the children with their college applications and facilitated their education. Juli further testified that the loans were initially incurred in July 2018 before the children started school, and every July thereafter, most recently in 2022. She also testified that before she took out the first loans in 2018, she and Cyrus had a conversation about the loans and that Cyrus agreed to incur the loans. She further testified that for the next couple years, she and Cyrus had similar discussions about incurring more student loans before each school year, but that for the final year, she applied for the loans without conferring with Cyrus. However, Juli testified that it was her understanding based on her earlier discussions with Cyrus that he knew the loans would be taken out each year if there was a remaining balance on their children's school tuition after their scholarships and grants were applied. Juli testified that there was $110,000 in student loan debt and requested that the debt be divided equally between Cyrus and her.

Cyrus conversely testified that Juli "didn't consult with [him]" about the student loans, but, rather, she "went and just applied for it." Cyrus testified that Juli did not tell him that she had obtained the loans until after the fact. Cyrus stated that he wanted his children to be "accountable" for their own

education by paying off their own loans after they graduated. At the same time, Cyrus testified and provided documentary evidence to show that he regularly sent money to both children for school-related expenses. He further explained that he paid for his son's room and board—approximately $20,000 annually—directly to the college. Cyrus ultimately stated that he believed Juli should be entirely responsible for the student loans because she did not consult with him "in the beginning" and "she didn't get [his] opinion."

## 2. District Court Decree

The district court entered a decree of dissolution on October 5, 2022. The decree stated that "[t]he Court was able to assess the credibility of the parties and the weight to be given to their testimony . . . . The Court ultimately give[s] greater weight to the testimony of [Juli]."

As relevant to the issues raised on appeal, the decree ordered that Cyrus pay Juli alimony in the amount of $1,000 per month for 60 months. In support of the alimony award, the decree stated the following:

> The evidence showed that [Cyrus] contemplated his unemploy[ment] as a means to thwart these proceedings . . . . There was no evidence received to show [Cyrus] was unable to work at this time nor any evidence to show that he . . . attempted to find work. He did, however, testify that at 65 years old, he intends to work for the next five years before he considers retirement when he will collect social security. As such, the Court finds that alimony is appropriate in this case and that [Cyrus] has the ability to pay.

The decree also ordered that Cyrus pay Juli $53,200.29 as an equalization of the parties' nonretirement assets. The decree further ordered that each party keep the personal property in his or her possession and that Juli was awarded the video games located in a storage unit. The court also adopted and attached to the decree Juli's proposed marital

estate distribution. Finally, the decree ordered that the student loans incurred in Juli's name were "taken out by the parties for the benefit of [their] children" and will be equally divided between the parties.

### 3. Cyrus' Motion to Alter or for New Trial

Cyrus timely filed a motion to alter the judgment or, alternatively, for a new trial. Juli objected, and at a hearing on the matter, Cyrus raised several of the arguments that he now raises on appeal. The district court denied the motion.

Cyrus appealed, and we moved the case to our docket.[1]

## III. ASSIGNMENTS OF ERROR

Cyrus assigns, restated, that the district court erred in (1) awarding Juli alimony, (2) awarding Juli a $53,200.29 equalization payment, and (3) classifying the student loans incurred for the parties' "adult children" as marital debt subject to equal division.

## IV. STANDARD OF REVIEW

[1-3] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.[2] This standard of review applies to the trial court's determinations of alimony and property division.[3] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.[4] When evidence is in conflict, the appellate court considers and may give weight to the fact that the

---

[1] See Neb. Rev. Stat. § 24-1106(3) (Cum. Supp. 2022).

[2] See *Karas v. Karas*, 314 Neb. 857, 993 N.W.2d 473 (2023).

[3] *Id.*

[4] *Id.*

trial court heard and observed the witnesses and accepted one version of the facts rather than another.[5]

[4] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[6]

## V. ANALYSIS

[5] Cyrus' appeal raises issues of alimony and the classification and division of property following the dissolution of the parties' marriage. In a dissolution of marriage proceeding, Neb. Rev. Stat. § 42-365 (Reissue 2016) allows a court to order payment of such alimony by one party to the other and division of property as may be reasonable.[7] What constitutes a reasonable alimony award and division of marital property depends on the facts of each case, but to make that determination, a court may consider, among other things, the circumstances of the parties, the duration of the marriage, and the history of the contributions to the marriage by each party, including contributions to the care and education of the children.[8]

[6] While the criteria for reaching a reasonable alimony award and division of property may overlap, the two serve different purposes and are to be considered separately.[9] Section 42-365 explains that "[t]he purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances . . . make it appropriate." Conversely, "[t]he purpose of property division is to distribute the marital assets equitably between the

---

[5] *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023).

[6] *Karas, supra* note 2.

[7] See *id.*

[8] See § 42-365.

[9] See *id.*

parties."[10] With these principles of reasonableness and equity as our guide, we turn to Cyrus' assignments of error.

## 1. ALIMONY

Cyrus argues that the district court abused its discretion in awarding Juli alimony because it failed to consider Juli's recent inheritance, Cyrus' age, and generally Juli's lack of a need for alimony as compared to Cyrus' ability to pay. We find no abuse of discretion here.

[7] In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as the trial court did, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result.[11] Further, an appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.[12] Again, the ultimate criterion is one of reasonableness.[13]

### (a) Juli's Inheritance

[8] Cyrus claims that the inheritance Juli received after the divorce filing, but before the divorce decree, should have precluded her from being awarded alimony. Cyrus is correct that although property accumulated and acquired by a spouse through an inheritance should generally not be considered property part of the marital estate,[14] a court can certainly consider inheritance when deciding to award alimony.[15] As stated previously, the division of marital property and the award of alimony are separate inquiries under § 42-365. The fact that property is inherited and therefore excluded from division in a dissolution proceeding does not prevent the

---

[10] *Id.*

[11] *Karas, supra* note 2.

[12] *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019).

[13] *Id.*

[14] See *id.*

[15] See *Ainslie v. Ainslie*, 249 Neb. 656, 545 N.W.2d 90 (1996).

income it generates from being considered when determining alimony.[16] In weighing a request for alimony, the court may consider all the property owned by the parties when entering the decree, whether accumulated by their joint efforts or acquired by inheritance.[17]

We take Cyrus' argument that the district court did not "consider" or "acknowledge" Juli's inheritance in awarding alimony[18] to mean either that the decree was silent as to the inheritance or that the district court failed to give the inheritance adequate weight as compared to the other reasons for awarding alimony. Neither argument has merit.

[9] Although the decree does not state that the district court considered Juli's inheritance in awarding her alimony, neither does it state that the inheritance was disregarded. Generally, we do not require a district court to explain its reasoning.[19] The parties spent considerable time at the trial testifying about Juli's inheritance. They also offered numerous exhibits showing the balance of several of Juli's accounts, some of which the parties agreed derived from her inheritance. As such, we do not find anything in the record to suggest that the district court was not cognizant of Juli's inheritance when it awarded her alimony.

As to the weight given to Juli's inheritance, Juli testified that she received $160,000 in inheritance from her father's estate and that approximately $120,000 of inherited funds were initially placed in a savings account before being divided among different retirement and bank accounts. However, the record is unclear as to exactly how much of the inherited funds Juli had in which accounts and whether the accounts that held inherited funds generated income. Upon our review of the record, the most that can be said is that at or near the time of

---

[16] See *id.*

[17] *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

[18] See brief for appellant at 15.

[19] *Brumbaugh v. Bendorf*, 306 Neb. 250, 945 N.W.2d 116 (2020).

the divorce proceedings, Juli had as much as $39,000 in inherited funds in her checking account, $37,000 in inherited funds in her IRA account, and $35,000 in inherited funds in one of her savings accounts.

While those inherited funds were assets, there was no evidence presented that the funds actively generated income or could have been readily accessed or liquidated by Juli. Taking into consideration the limited evidence concerning Juli's inheritance, we find the statutory factors relevant to an award of alimony support the trial court's determination.

### (b) Cyrus' Age

Cyrus also argues that the district court erred in awarding Juli alimony because of his "advanced age."[20] In doing so, Cyrus contends that the Nebraska Court of Appeals' decision in *Kramer v. Kramer*[21] stands for the proposition that alimony cannot be ordered to be paid by an individual over 62 years of age. Cyrus' reliance on *Kramer* is misplaced.

The court in *Kramer* did not hold that alimony could never be awarded beyond age 62; instead, it held that a divorce decree awarding lifetime alimony was unreasonable under the circumstances of that case and that the award should be reduced to a 15-year term.[22] Indeed, the Court of Appeals itself clarified some years later in an unpublished opinion that "th[e] reliance on *Kramer* for the proposition that alimony should not be awarded after the obligor reaches 62 years of age is improper."[23] We agree.

[10] This court has never suggested that there is an age at which a party to a divorce is too old to pay alimony. Rather, the terms of an award of alimony depend on what is reasonable under the circumstances of each case. We have held that

---

[20] See brief for appellant at 14.

[21] *Kramer v. Kramer*, 1 Neb. App. 641, 510 N.W.2d 351 (1993).

[22] See *id.*

[23] *Paschall v. Paschall*, No. A-12-668, 2013 WL 5366330 at *3 (Neb. App. July 16, 2013) (selected for posting to court website).

the primary purpose of alimony is to assist an ex-spouse for a reasonable period of time necessary for that individual to secure his or her own means of support.[24] Ultimately, the duration of an alimony award must be reasonable.[25] We find that the 5-year duration of alimony here qualifies as such. While Cyrus will be 70 years old when his alimony obligation terminates, he testified that he "would like to work up to . . . maybe 70 plus," then confirmed he "intend[ed] to work for the next [5] years at least" if he was able.

### (c) Juli's Need for Alimony Versus
### Cyrus' Ability to Pay

As to Cyrus' argument that the district court erred in awarding Juli alimony because it failed to consider Juli's lack of a need for alimony as compared to Cyrus' ability to pay, we disagree. Specifically, we do not find that the district court's order of alimony was an improper attempt to equalize the parties' income, as Cyrus asserts.

[11] Alimony should not be used as a tool to equalize the parties' incomes or to punish one of the parties.[26] However, a disparity of income or potential income might partially justify an alimony award.[27] The district court found a significant disparity in the incomes here. We find no abuse of discretion in that conclusion.

Cyrus testified that he could earn up to $140,000 per contract. While his work appeared to have some income volatility, it is also apparent that his earning potential was several times that of Juli's. Over the past 20 years, Cyrus made more than $100,000 per year numerous times. For Cyrus' most recent contract, he earned $143,000 to $145,000 annually.

---

[24] *Karas, supra* note 2; *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018).

[25] *Wiedel, supra* note 24.

[26] See *Karas, supra* note 2; *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

[27] *Simons, supra* note 26.

Additionally, Cyrus testified that his monthly expenses were approximately $4,000. Juli, on the other hand, earned approximately $40,000 annually, and her monthly expenses were also approximately $4,000. As such, the district court did not abuse its discretion when it found that Cyrus should pay alimony to Juli in the amount of $1,000 per month for 5 years.

Relatedly, we find no merit in Cyrus' argument that he is unable to pay alimony because he was unemployed for the 6 months preceding the trial. The district court found that Cyrus' unemployment was voluntary and that he attempted to use a job offer as leverage for Juli to "suspend" the divorce proceedings. We have no basis to disagree. Cyrus argues on appeal that he chose to not take the job offer because he did not want to receive the COVID-19 vaccine required by the employer. However, the record shows that Cyrus communicated to both Juli and the parties' children that he was willing to "proceed with taking [the] vaccines to stay employed . . . if Juli suspend[ed] the divorce case," among other terms. When Juli did not agree to Cyrus' terms, Cyrus communicated that he was "volunteering" to decline the vaccine and that he would be unemployed and unable to provide for the family in the future. Based on this evidence, we find no abuse of discretion in the district court's finding that Cyrus "contemplated his unemploy[ment] as a means to thwart these proceedings."

We similarly find no merit in Cyrus' remaining arguments about Juli's lack of a need for alimony and his inability to pay. As stated previously, we do not determine whether we would have awarded the same amount of alimony that the district court did, but we instead only determine whether the alimony award was an abuse of discretion.[28] The alimony award here was reasonable, not an abuse of discretion, and we are not inclined to disturb it.[29]

---

[28] See *Karas, supra* note 2.

[29] See, *id.*; *Dooling, supra* note 12.

### 2. Equalization Payment

Cyrus next argues that the district court erred in ordering him to pay Juli a $53,200.29 equalization payment. He contends that the court failed to credit him for the reduction in his portion of the marital estate in the time between the divorce filing and the trial and that the video games in storage that were awarded to Juli had not been included in her proposed marital distribution. We find no abuse of discretion here.

### (a) Valuation Date

The district court valued Cyrus' bank account approximately 1 month after the date of the divorce filing. Cyrus argues that the court should have instead valued the account at the date of the trial and that when it did not, it failed to properly credit him for the reduction in his portion of the marital estate.

[12,13] The purpose of assigning a date of valuation in a dissolution decree is to ensure that the marital estate is equitably divided.[30] It is well settled that, generally, the date upon which a marital estate is valued must be rationally related to the property composing the marital estate and the property being divided.[31] We have declined to tie the hands of the district court and mandate that it must use only one particular valuation date in equitably dividing the marital estate.[32] The date of valuation is reviewed for an abuse of the trial court's discretion.[33]

Cyrus' bank account was valued at $115,100 on August 11, 2021, a date and value that was supported by evidence admitted at the trial. Cyrus did not dispute the account's value on the valuation date; he only testified that since then, the account had depleted to a lesser amount. However, Cyrus did

---

[30] *Karas, supra* note 2.

[31] See, *id.*; *Dooling, supra* note 12; *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019*)*.

[32] See, e.g., *Rohde, supra* note 31.

[33] *Eis v. Eis*, 310 Neb. 243, 965 N.W.2d 19 (2021).

not introduce bank statements or other evidence to support his assertion.

In both *Karas v. Karas*[34] and *Dooling v. Dooling*,[35] for example, we held that the trial court did not abuse its discretion in valuing a spouse's marital asset on one date, despite the spouse's argument that a different valuation date more accurately reflected the lesser value of the asset, when the spouse did not offer evidence of that asset's lesser value on that date to the court. We reach the same conclusion here and find that Cyrus failed to adequately offer evidence of the account's value at or near the trial date.

Further, all the parties' assets and debts were valued between July and November 2021, not just Cyrus' account. We decline to single out Cyrus' most valuable marital asset and hold that the district court should have valued it as of another date. The district court's valuation date was rationally related to Cyrus' account, as well as the other property in the parties' marital estate. We thus cannot say it was an abuse of discretion for the district court to value Cyrus' account near the divorce filing.

### (b) Video Games

There was also testimony from both parties about a storage unit that held various items, including video games that the parties valued at approximately $30,000. Cyrus paid for the monthly costs of the storage unit, and although he testified that he would rather Juli be responsible for the costs and items of the storage unit, save his personal property and their children's property, he also testified that he would continue paying for the unit if Juli did not want any of the household property in it. Juli testified that Cyrus could have everything in the storage unit besides their son's video games, which she requested that she be awarded so that she could deliver them to their son.

---

[34] *Karas, supra* note 2.

[35] *Dooling, supra* note 12.

Cyrus is correct that the contents of the storage unit were not included on the proposed marital distribution worksheet. In fact, the only mention of the storage unit in the district court's decree was that Juli was awarded the video games in the unit and that she was responsible for transporting them. It is clear from the parties' testimony, however, that the video games were intended for their son and that Juli planned to deliver them to him. Cyrus' argument that the value of the video games was to Juli's benefit and should have reduced the equalization payment is without merit.

### 3. Student Loan Debt

Cyrus lastly argues that the district court erred in classifying the student loans incurred for the parties' children as a marital debt that was to be equally divided between the parties. Again, we find no abuse of discretion.

Cyrus argues that the student loans should not have been classified as marital debt because the loans were taken out for the benefit of their children, rather than the parties' benefit. He contends that the student loans here are akin to loans taken out by one party to a divorce for that party's own benefit and that Juli should be entirely responsible for the loans. Juli disagrees and argues that the student loans were incurred for the benefit of the parties and thus should not be treated differently than any other debt incurred during the marriage.

Cyrus relies on two cases from the Nebraska Court of Appeals to support his contention that student loans are to be considered marital debt only if the loans are disbursed for the benefit of the marriage. In *Walker v. Walker*,[36] the Court of Appeals concluded that the district court did not abuse its discretion in finding student loan debt incurred during the marriage to be nonmarital where the parties disputed the extent to which the student loans were used for joint marital interests or the obligor's education. Specifically, the appellate court

---

[36] *Walker v. Walker*, 9 Neb. App. 694, 618 N.W.2d 465 (2000).

held that equity required the wife to take with her the student loan debt incurred when she obtained her law degree, as she took with her all the benefit of the degree. [37]

In *Wright v. Wright*,[38] the Court of Appeals similarly held that a trial court did not abuse its discretion when it did not divide student loan debt incurred by a spouse to further his education. The trial court found that there was insufficient evidence to determine an equitable amount to attribute as marital debt because some of the debt was used to finance the education and some of the debt was used to pay the parties' bills. The appellate court agreed that the record was insufficient to determine how much of the debt was marital. [39]

Although *Walker* and *Wright* considered whether certain student loan debt was marital debt, neither case is directly on point with the facts of this case. The student loan debts incurred in those cases were debts incurred for the education of one of the parties in the divorce and not for the parties' children. Additionally, there was no evidence in those cases as to an agreement of the parties concerning the debt. As such, the two cases offer limited guidance in determining the issue now before us.

[14] Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. [40] Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. [41] Debts, like property, should be considered in dividing marital property upon dissolution. [42] It is well settled in Nebraska that marital debt includes only those obligations incurred during the marriage

---

[37] *Id.*

[38] *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021).

[39] *Id.*

[40] *Karas, supra* note 2.

[41] *Dooling, supra* note 12.

[42] See, *Carter v. Carter*, 261 Neb. 881, 626 N.W.2d 576 (2001); *Anderson v. Anderson*, 27 Neb. App. 547, 934 N.W.2d 497 (2019).

for the joint benefit of the parties.[43] This is a flexible, fact-specific standard.[44]

As summarized previously, there was competing evidence at the trial as to whether the parties agreed to, or at least discussed, incurring the student loans for their children. Juli testified that before she incurred the loans, she and Cyrus discussed the loans, and that Cyrus expressly agreed to them. She further testified that she had similar discussions with Cyrus every year, except the year immediately prior to the divorce, before she renewed the student loans. Cyrus conversely testified that no such discussions were had and that he did not agree to the loans and did not know about them until after the fact.

The district court heard this competing evidence and determined that Juli's testimony was more credible. In doing so, the court concluded that the parties agreed to incur the student loan debt during the marriage. We give weight to that factual finding.

In our earlier decisions dealing with classifying a debt as marital, the facts of each case and whether the party claiming the debt was nonmarital offered sufficient evidence at trial to satisfy that party's burden of proof is what drove the analysis. Where there was no evidence, or competing evidence, as to whether the parties agreed to incur a debt during the marriage for their joint benefit, we have given weight to trial courts' credibility assessments and generally found no abuse of discretion in their factual findings.[45] Again, when evidence is in conflict, the appellate court considers and may give weight

---

[43] *Karas, supra* note 2; *Vanderveer v. Vanderveer*, 310 Neb. 196, 964 N.W.2d 694 (2021); *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018); *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006); *Mathews v. Mathews*, 267 Neb. 604, 676 N.W.2d 42 (2004).

[44] *Vanderveer, supra* note 43.

[45] See, e.g., *Karas, supra* note 2; *Kauk v. Kauk*, 310 Neb. 329, 966 N.W.2d 45 (2021); *Vanderveer, supra* note 43; *Fetherkile, supra* note 43; *Millatmal, supra* note 43; *Mathews, supra* note 43.

to the fact that the trial court heard and observed the witnesses and accepted one version of facts rather than another.[46] As such, we find no abuse of discretion in the district court's division of the student loan debt.

With that determination being made, we note that, as a general rule, absent agreement of the parties, a Nebraska district court cannot order a party to pay child support beyond the age of majority.[47] Nothing in this opinion should be understood to condone the unilateral incurring of postseparation indebtedness as a subterfuge to evade this principle.

Cyrus' further argument that the student loan debt could have been treated as a nonmarital debt because it was incurred after the parties separated is without merit. To the contrary, we have expressly declined to adopt a rule requiring that debts must be incurred before separation to be considered marital.[48]

## VI. CONCLUSION

For the foregoing reasons, the district court did not abuse its discretion in awarding alimony and the equalization payment and in equally dividing the student loan debts between the parties.

AFFIRMED.

---

[46] *Parde, supra* note 5.

[47] *Carlson v. Carlson*, 299 Neb. 526, 909 N.W.2d 351 (2018). See, *Johnson v. Johnson*, 308 Neb. 623, 956 N.W.2d 261 (2021); *Windham v. Kroll*, 307 Neb. 947, 951 N.W.2d 744 (2020); *Wood v. Wood*, 266 Neb. 580, 667 N.W.2d 235 (2003); *Foster v. Foster*, 266 Neb. 32, 662 N.W.2d 191 (2003); *Groseth v. Groseth*, 257 Neb. 525, 600 N.W.2d 159 (1999); *Zetterman v. Zetterman*, 245 Neb. 255, 512 N.W.2d 622 (1994). See, also, *Henderson v. Henderson*, 264 Neb. 916, 653 N.W.2d 226 (2002); *Kimbrough v. Kimbrough*, 228 Neb. 358, 422 N.W.2d 556 (1988); *Meyers v. Meyers*, 222 Neb. 370, 383 N.W.2d 784 (1986); *Waldbaum v. Waldbaum*, 171 Neb. 625, 107 N.W.2d 407 (1961); *Moore v. Bauer*, 11 Neb. App. 572, 657 N.W.2d 25 (2003); *Boamah-Wiafe v. Rashleigh*, 9 Neb. App. 503, 614 N.W.2d 778 (2000).

[48] See *Vanderveer, supra* note 43.