Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/03/2023 09:08 AM CDT

Jeffry P. Macy II, appellant and
cross-appellee, v. Megan A. Macy,
appellee and cross-appellant.

___ N.W.2d ___

Filed September 26, 2023.    No. A-22-528.

1.  **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.

2.  **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.

3.  **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4.  **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

5.  **Divorce: Property Division: Equity.** Neb. Rev. Stat. § 42-365 (Reissue 2016) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances.

6.  **Divorce: Property Division.** In a marital dissolution action, the purpose of a property division is to distribute the marital assets equitably between the parties.

7.  ____: ____. In a marital dissolution action, there is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of

the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.

8. ____: ____. In a dissolution action, the equitable division of property is a three-step process. The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property to the party who brought the property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. And the third step is to calculate and divide the net marital estate equitably between the parties.

9. ____: ____. As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule.

10. **Divorce: Property Division: Proof.** In a marital dissolution proceeding, the burden of proof rests with the party claiming that property is nonmarital.

11. **Property Division.** The date upon which the marital estate is valued should be rationally related to the property composing the marital estate.

12. **Divorce: Property Division: Pensions.** In dissolution actions, district courts have broad discretion in valuing pension rights and dividing such rights between the parties.

13. **Property Division: Appeal and Error.** The date of valuation of a marital estate is reviewed for an abuse of the trial court's discretion.

14. **Property Division.** A trial court is not required to use only one valuation date for marital assets and marital debts in equitably dividing a marital estate.

15. ____. The purpose of assigning a date of valuation of a marital estate in a decree is to ensure that the marital estate is equitably divided.

16. ____. The choice of a date as of which marital assets are available for equitable distribution should be identified and valued must be dictated largely by pragmatic considerations.

17. ____. The division of property is not subject to a precise mathematical formula.

18. **Evidence: Appeal and Error.** When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

19. **Judgments: Final Orders: Words and Phrases.** A "judgment" is a court's final consideration and determination of the respective rights and obligations of the parties to an action as those rights and obligations presently exist.

20. **Judgments: Equity.** The void conditional judgment rule does not extend to actions in equity or to equitable relief granted within an

action at law. Rather, where it is necessary and equitable to do so, a court of equitable jurisdiction may enter a conditional judgment and such judgment will not be deemed void simply by virtue of its conditional nature.

21. **Judgments: Equity: Collateral Attack.** Simply because a conditional judgment in an action at equity is not automatically void, it does not follow that all conditional judgments are acceptable on direct review or that judgments in equity cannot, for different reasons, be void and therefore subject to collateral attack.

22. **Judgments: Equity.** Conditional judgments in equity are required to determine the rights and obligations of the parties with reasonable certainty.

23. **Divorce: Property Division: Pensions.** Marital assets are subject to equitable division in a dissolution proceeding, and retirement benefits, whether vested or not vested, are eligible for inclusion in the marital estate.

24. **Divorce: Property Division: Armed Forces: Pensions.** Neb. Rev. Stat. § 42-366(8) (Reissue 2016) requires that a nonvested military pension be treated as marital property in a dissolution proceeding.

25. **Divorce: Child Custody.** When custody of minor children is an issue in a proceeding to dissolve the marriage of the children's parents, custody is determined by parental fitness and the children's best interests.

26. **Child Custody.** When both parents are found to be fit, the inquiry for the court on the issue of custody is the best interests of the children.

27. ____. When determining the best interests of the child in deciding custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse.

28. **Visitation.** The Parenting Act provides that the best interests of a child require a parenting plan that provides for a child's safety, emotional growth, health, stability, physical care, and regular school attendance, and which promotes a child's continued contact with his or her families and parents who have shown the ability to act in the child's best interests.

29. **Divorce: Property Division: Alimony.** In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the

marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. In addition, a court should consider the income and earning capacity of each party and the general equities of the situation.

30. **Alimony.** The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate.

31. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. The ultimate criterion is one of reasonableness.

32. ____: ____. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.

33. **Property Division.** Marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties.

Appeal from the District Court for Scotts Bluff County: Leo P. Dobrovolny, Judge. Affirmed in part, affirmed in part as modified, vacated in part, and in part reversed and remanded with directions.

Adam R. Little, of Nebraska Legal Group, for appellant.

Rhonda R. Flower, of the Law Office of Rhonda R. Flower, for appellee.

Riedmann, Bishop, and Welch, Judges.

Welch, Judge.

## I. INTRODUCTION

Jeffry P. Macy II appeals and Megan A. Macy cross-appeals from the Scotts Bluff County District Court's order dissolving their marriage and adjudicating issues of custody, property classification and division, and alimony. For the reasons stated herein, we affirm in part, affirm in part as modified, vacate in part, and in part reverse and remand with directions.

## II. STATEMENT OF FACTS

The parties were married in August 2008 and had two children during the course of their marriage: twins who were born in 2009. During the parties' marriage, Jeffry was a commissioned officer in the U.S. Navy, which job required the family to reside in at least four different locations in California and Maryland. During the marriage, Megan primarily took care of the home and the children, while also earning an undergraduate degree and a master's degree, which involved incurring student loan debt. After the children entered kindergarten, Megan was employed teaching at different schools at the various duty stations. In October 2018, based upon the parties' agreement, Megan began homeschooling the children.

In March 2019, Megan and the children relocated to Nebraska to care for Megan's father, who had suffered a heart attack. Because Jeffry was still actively serving in the Navy, he was unable to relocate to Nebraska with the family. Megan testified that the parties separated in May 2019, shortly after her move to Nebraska. Despite their separation, the parties purchased a house in Nebraska in July 2019, and Jeffry provided Megan with $3,000 to $3,500 in monthly support. Jeffry rented a room and a storage locker in California. Megan testified that after moving to Nebraska, she obtained employment as a teacher, earning approximately $63,000 per year in addition to receiving Department of Veterans Affairs (VA) disability benefits that she testified would decrease after the divorce to $758.28 monthly.

In May 2020, Jeffry filed for dissolution of marriage, requesting, inter alia, joint legal and physical custody of the parties' minor children. In her answer and counterclaim, Megan requested, inter alia, legal and physical custody of the parties' minor children. The dissolution proceeding was held over 2 days in February and March 2022. During the trial, witnesses included Jeffry; Megan; the parties' children; and Adam Astley, an attorney specializing in dissolutions and military benefits.

Additionally, the parties offered into evidence a joint property statement, among other exhibits.

Jeffry testified that after Megan and the children relocated to Nebraska, he had difficulty visiting the children due to his deployment schedule and his visits were generally limited to holidays. Due, in part, to his desire to be closer to his children, Jeffry decided to separate from the Navy and was honorably discharged on September 30, 2021, after 13 years of service. Jeffry subsequently moved to Nebraska and purchased a separate home. At the time of the trial, Jeffry was employed full time as "a director of IT in cyber operations," earning $150,000 a year. He was also employed part time, earning $33,000 as a remote teacher at a university, but he indicated that this position was temporary. After moving to Nebraska, Jeffry exercised parenting time on Monday and Wednesday evenings after the children were done with school and one weekend per month.

Jeffry testified that he requested joint physical and legal custody of the children because the children informed him that they wanted equal time with both parents. Megan, on the other hand, testified that, in her opinion, joint custody was not in the children's best interests because Jeffry needed additional time to acclimate to spending more time with the children, needed to make sure his environment was proper for the children, and needed to get used to having only one job, and also because there was an incident during Jeffry's parenting time when one of the children located a loaded gun. The parties' children testified that they had good relationships with both of their parents and wanted equal time with them.

As it related to the division of the marital property, the parties entered into a property settlement agreement where they generally agreed on the valuation of most of the parties' debts and assets and how to divide the marital property. During the trial, the parties disputed the value and classification of certain debts and assets. Specifically, they disputed the classification of Megan's student loans and a credit card, the value of

a motorcycle, the valuation of debt related to a fence installed at the home where Megan and the children resided, the date of valuation of Jeffry's Thrift Savings Plan (TSP), and the division of his military benefits.

Megan adduced testimony from Astley, an attorney specializing in difficult dissolution cases. Astley testified regarding the military benefits and credits at issue in this case. Astley testified that because Jeffry did not complete 20 years of service in the Navy, his military pension benefit remained unvested unless he either reentered the military or began working in the federal sector, which would provide Jeffry with the opportunity to buy back his 13 years of service and, if in total, he accumulated 20 years, he would be eligible to receive his pension. As a result, Astley testified that the court should include those potential benefits in the division of the marital estate when entering the final decree, and he provided the proposed language that is required in the decree to properly divide those benefits.

In June 2022, the district court entered a decree dissolving the parties' marriage, awarding the parties joint physical and legal custody of the parties' minor children, and dividing the marital estate. Specifically, as relevant to this appeal, the district court awarded Megan alimony of $250 per month for 60 months; awarded Jeffry the motorcycle, which the court valued at $2,000; classified $27,453 of Megan's student loans and $2,893 in Megan's credit card debt incurred during the parties' marriage as marital debt; and determined that Megan's payment of $8,000 for the installation of a fence at the marital property should be credited to her.

Further, regarding Jeffry's military "credits," the court found that Jeffry

> served as an active[-]duty member of the U.S. Navy for more than ten (10) years overlapping ten (10) years of marriage. The credits that [Jeffry] earned during his service are a marital asset, subject to division by this Court. [Jeffry] separated from active[-]duty service on

September 30, 2021, having served less than twenty (20) years.

Should [Jeffry] re-enter active[-]duty military service at any time during his lifetime, he shall promptly notify [Megan] of his re-entry. Should [Jeffry] complete a total of twenty (20) or more years of military service, [Megan] will be awarded a portion of [Jeffry's] military retired pay, as described in this section, and with the following factual findings, legal conclusions, and information necessary for [Defense Finance and Accounting Service] to effectuate this award.

(Emphasis omitted.) The court awarded Megan 50 percent of the disposable military retired pay that Jeffry "would have received had he retired with a retired base (High-3) of $7,630 per month, and with 12.75 years of credi[ta]ble service on July 31, 2021. This award shall include [50 percent] of all future cost-of-living adjustments ('COLA's')." (Emphasis omitted.)

In addition to the award of the disposable military retired pay, the court's award went further and stated:

[Jeffry] shall also promptly notify [Megan] if he obtains employment with any government branch or agency which will permit him to obtain any credit towards any other government retirement system in consideration for the credits he earned while in the military. His notification must include the name of the branch or agency, and the retirement system in which he will participate. If [Jeffry] obtains such employment having not completed twenty (20) years of military service, he shall be entitled to sell, merge, trade, or waive his military retirement credits for credits with such agency's retirement system (this shall include the right to make a "Military Service Credit Deposit" with the government).

If [Jeffry] makes such a deposit or sells, merges, trades, or waives his military retired pay in return for credits under the agency's retirement system, [Megan] will be awarded a portion of [Jeffry's] retirement under

that system which is equal to one-half of a fraction, the numerator of which is 153 months (12 years, 9 months), and the denominator of which is the total number of months of equivalent service recognized by the agency to include service after the marriage and any service credits obtained by selling merging, trading, or waiving military retired pay or by making a Military Service Credit Deposit. In such case, [Megan] shall also be awarded a survivor annuity in a sufficient amount to continue her benefits at the same level in the event [Jeffry] predeceases [sic] her. [Megan's] portion of this benefit will be perfected by entry of an appropriate order or instrument which complies with the requirements of the system in which [Jeffry] participates.

If [Jeffry] is able to sell or waive his military retired pay credits outright in return for a fixed sum of money or property (such as, for example, funds deposited in a TSP or similar Plan), [Jeffry] shall promptly notify [Megan] of the sale or waiver, including a description of the money or property he received and the Plan to which it is attached, and [Megan] shall be awarded ½ of the proceeds of such sale or waiver.

(Emphasis omitted.) Jeffry appeals, and Megan cross-appeals, from the court's order.

### III. ASSIGNMENTS OF ERROR

Jeffry's assignments of error, consolidated and restated, are that the district court abused its discretion by (a) improperly classifying as marital debt $27,453 in Megan's student loans, $8,000 for a replacement fence, and $2,893 in Megan's credit card debt; (b) improperly valuing Jeffry's TSP and the motorcycle; (c) improperly calculating the equalization payment; and (d) entering a conditional judgment of unvested military "credits" that did not determine the rights or obligations of the parties with reasonable certainty.

Megan cross-appeals, arguing that the district court abused its discretion in awarding the parties joint legal and physical custody, awarding alimony of $250 per month for 60 months, and including $3,000 in Jeffry's attorney fees in its division of the parties' marital estate.

## IV. STANDARD OF REVIEW

[1-3] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Eis v. Eis*, 310 Neb. 243, 965 N.W.2d 19 (2021). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

[4] When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021).

## V. ANALYSIS

### 1. Jeffry's Appeal

#### (a) Classification and Valuation of Marital Debt

Jeffry first assigns as error that the district court abused its discretion in classifying the following as marital debt: (i) $27,453 of Megan's student loans incurred during the parties' marriage, (ii) Megan's payment of $8,000 for the installation of a fence, and (iii) $2,893 of Megan's credit card debt.

[5-7] Neb. Rev. Stat. § 42-365 (Reissue 2016) authorizes a trial court to equitably distribute the marital estate according to what is fair and reasonable under the circumstances. *Parde v. Parde*, 313 Neb. 779, 986 N.W.2d 504 (2023). In a marital dissolution action, the purpose of a property division is to distribute the marital assets equitably between the parties. *Id.* There is no mathematical formula by which property awards can be precisely determined, but as a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id*.

[8] In *Kauk v. Kauk*, 310 Neb. 329, 336, 966 N.W.2d 45, 52 (2021), the Nebraska Supreme Court discussed the three-step process under § 42-365 for the division of property, stating:

> In a dissolution action, the equitable division of property is a three-step process. The first step is to classify the parties' property as either marital or nonmarital, setting aside the nonmarital property to the party who brought the property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. And the third step is to calculate and divide the net marital estate equitably between the parties.

### (i) Classification of Student Loans

Jeffry argues that the district court erred in classifying $27,453 of Megan's student loans incurred during the parties' marriage as marital debt because Megan failed to provide any documentation showing that the loans were used for marital expenses.

[9-10] As a general rule, all property accumulated and acquired by either spouse during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Sitz v. Sitz*, 275 Neb. 832, 749 N.W.2d 470 (2008). In a marital dissolution proceeding, the burden of proof rests with the party claiming that property is nonmarital. *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021).

Here, the parties do not dispute that, during the course of the parties' marriage and prior to their separation, Megan incurred student loans to further her education. During the dissolution hearing, both Jeffry and Megan acknowledged that some of the funds were used for marital expenses, including to pay off debt associated with Megan's wedding ring. Jeffry specifically testified that "I know that they were used for living expenses. They were, also, used to buy her diamond ring that she wanted at the time, which we didn't include, because that's — I forgot what you told me, but it's like a $5,000 diamond ring . . . ."

In *Wright v. Wright, supra*, in classifying school debt incurred during the marriage as marital or nonmarital, this court reemphasized the importance of presenting a sufficient record that establishes the distribution and utilization of student loans incurred during the marriage as it relates to their proper classification. There, as here, the evidence inadequately indicated where the loan proceeds were actually spent, save only the limited evidence presented above that suggested the loans were utilized for marital purposes. Similar to *Wright*, in the absence of further evidence and context governing the balance on the student loans, and in recognition of the fact that the burden belonged to Jeffry to show this debt incurred during the marriage was nonmarital, we cannot say the district court abused its discretion in attributing the debt as marital on the limited evidence presented on this topic. This assignment of error fails.

### (ii) Classification of Fence

Jeffry next argues that the district court abused its discretion in determining that $8,000 paid for the installation of a fence on the marital property was a marital debt. Specifically, Jeffry contends that because Megan paid $7,000 up front for the fence, only the $1,141.09 that remained to be paid on the fence should have been included in the marital estate.

During the proceedings, the district court received two invoices sent to Megan for the cost of the fence. The evidence

showed that after the complaint for dissolution had been filed, Megan had a fence installed to replace a fence that was rotting and was not secured. However, after the work began, Megan noticed that a portion of the fence was not being taken down and she was informed that the portion of the fence needing repair was not included in the initial estimate. Megan paid the June 2020 invoice of $7,000. Thereafter, in August 2020, Megan received, and paid, a second invoice in the amount of $1,141.09. The parties did not dispute that the debt was paid after the parties' separation but prior to trial; however, Megan argued that because the value of the home increased by $33,000 due in part to the fence replacement, and the district court utilized the appreciated value of the property in the division of assets, she should be entitled to a credit of $8,000 paid for the fence.

The district court agreed and credited Megan for the amount of the fence. Based on the fact that the parties both received a benefit as a result of the increase in value of the home and that Jeffry also received a credit for mortgage payments made following the parties' separation, we cannot say it was unreasonable or unfair for the court to credit Megan for the $8,000 payment for the fence that at least partially contributed to the increase in the value of the marital home, which increase was ultimately shared by the parties. This assignment fails.

### (iii) Classification of Credit Card Debt

Jeffry also asserts that the district court erred in including $2,893 of Megan's credit card debt as marital debt. Jeffry contends that because Megan did not have any documentation supporting the balance on the credit card, inclusion of the debt was not supported on the record.

In a marital dissolution proceeding, the burden of proof rests with the party claiming that property is nonmarital. *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021).

During the trial, Megan testified that the $2,893 credit card was mislabeled as a USAA credit card balance on the parties'

joint property statement when the card was actually a different credit card. She indicated that the balance on the card was from "May of 2019 or the other date that was provided." Jeffry did not dispute Megan's testimony, nor argue during the proceedings that the credit card debt was not a marital debt. Because the undisputed evidence establishes that the $2,893 credit card balance was a debt accrued during the parties' marriage, prior to their separation, we find that the district court did not err in classifying the debt as marital. Accordingly, this claim fails.

## (b) Valuation of Assets

The second step in the three-part equitable division of property requires the valuation of the parties' marital assets and liabilities. In connection with this step, Jeffry takes issue with the court's valuation of his TSP account and his motorcycle. We will discuss those assignments separately.

### (i) TSP

Jeffry argues that the district court abused its discretion in valuing his TSP as of June 30, 2020, which resulted in a valuation of $69,784. He contends that the court should have valued the TSP account on the same date as the rest of the marital estate and that, had his TSP been valued as of March 31, 2020, it would have resulted in a value of $52,529.31.

[11-13] The date upon which the marital estate is valued should be rationally related to the property composing the marital estate. *Tyma v. Tyma*, 263 Neb. 873, 644 N.W.2d 139 (2002). In dissolution actions, district courts have broad discretion in valuing pension rights and dividing such rights between the parties. *Id.* The date of valuation of a marital estate is reviewed for an abuse of the trial court's discretion. See *Rohde v. Rohde*, 303 Neb. 85, 927 N.W.2d 37 (2019).

[14-16] In *Rohde v. Rohde*, 303 Neb. at 94-95, 927 N.W.2d at 45, the Nebraska Supreme Court addressed the issue of multiple valuation dates, stating:

We decline to mandate that a trial court must use only one valuation date in equitably dividing a marital estate. The date for valuation must be rationally related to the property being divided. Frequently, a single valuation date will be appropriate; but sometimes, it will not. The purpose of assigning a date of valuation in a decree is to ensure that the marital estate is equitably divided. This harkens back to the polestar of equitable division, which is fairness and reasonableness under the facts of the case. What may be a fair and reasonable valuation on one date for an asset may be unfair and unreasonable for another asset on the same date. "The choice of a date as of which assets available for equitable distribution should be identified and valued must be dictated largely by pragmatic considerations." It can become arduous for the district court to determine one date that fairly and reasonably values the entire marital estate. We choose not to tie the hands of the district court; thus, the court need not find "'[o]ne [date] to rule them all.'"

Here, Megan testified at trial that she believed that the TSP account should be valued as of June 30, 2020, because Jeffry stopped contributing to the plan after the parties decided to separate, despite the fact they had contributed about $1,000 per month to the TSP prior to that time. Thereafter, the account initially lost money through market fluctuations but eventually recovered. According to Megan, utilization of Jeffry's valuation date would result in a valuation during the period of time that the account's value slightly decreased.

The district court valued Jeffry's TSP based on Megan's proposed valuation date of June 30, 2020, which resulted in the TSP being valued at $69,784. The district court has discretion to utilize multiple dates to fairly and reasonably divide the marital estate so long as the valuation date is rationally related to the property being divided, and the district court did so in this case. Here, we find it both fair and reasonable that the court chose a valuation date that coincided with a date that

the TSP recovered its value through normal market fluctuations, rather than the date used for other valuations that were not susceptible to market fluctuations. Stated differently, had the court valued the account on the date proposed by Jeffry, he would have incurred a benefit from the downward market fluctuation that recovered shortly thereafter. Under these circumstances, we find that the district court did not abuse its discretion in using multiple valuation dates in order to achieve an equitable division of the marital estate. This assignment of error fails.

### (ii) Motorcycle

Jeffry contends that the district court erred in valuing a motorcycle at $2,000 without evidence to support such a value. He asserts that the district court should have accepted his value of $1,500 for the motorcycle.

[17,18] The division of property is not subject to a precise mathematical formula. *Pohlmann v. Pohlmann*, 20 Neb. App. 290, 824 N.W.2d 63 (2012). When evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Wright v. Wright*, 29 Neb. App. 787, 961 N.W.2d 834 (2021).

During the trial, the parties offered differing opinions regarding the motorcycle's value. Megan valued the motorcycle at $4,000 based on its Kelley Blue Book value but admitted that she was unsure of the motorcycle's mileage, which would have an impact on its total value. Jeffry, on the other hand, testified that he had purchased the motorcycle in 2014 for $6,000; that the motorcycle had 80,000 miles; that he accidentally knocked it over in the driveway, damaging the "right hand brake" and electronic components; and that the manufacturer would only give $500 credit for a trade-in value. He valued the damaged motorcycle at $1,500.

Here, the district court did not accept the specific values provided by either party, but instead valued the motorcycle at

$2,000, which was half of the Kelley Blue Book value proffered by Megan and more than Jeffry's proposed valuation of $1,500. We further note that the district court's valuation of the motorcycle is consistent with Jeffry's answers to interrogatories, which were received into evidence, wherein he valued the motorcycle at $2,000. We find that the district court did not abuse its discretion in choosing a value between the values proposed by the parties and that the valuation determined by the court was supported by the evidence. This assignment of error fails.

### (c) Calculation of Equalization Payment

Jeffry's next assignment of error is that the district court erred in calculating the equalization payment, because there was a $10,000 typographical error in the court's calculation. He further argues that, in combination with the cumulative errors as argued above, the equalization payment should have been $31,637.03.

After dividing up the marital estate, the district court summarized as follows:

Property and Debt Summary

|  | Jeffry | Megan |
| --- | --- | --- |
| Section A: | $2,270.00 | $5,645.00 |
| Section B: | $18,781.85 | $3,976.00 |
| Section C: | $9,000.00 | [$2,267.00] |
| Section E: | $57,957.00 | $46,786.66 |
| Section F: | $75,148.35 | $14,565.65 |
| Section J: | [$23,190.58] | [$38,436.00] |
| Totals: | $149,966.62 | $30,269.66 |

Payment from Jeffry to Megan to equalize the property division is $59,848.48.

We agree with Jeffry that the court's table contains a typographical error. In section J, Jeffry was assigned debt of

$13,190.58 for his USAA credit card, but the court's table incorrectly lists that debt as $23,190.58. However, the court's calculation of marital assets awarded to Jeffry utilized the correct $13,190.58 figure to reach the correct total of $149,966.62 of assets awarded to Jeffry. Since the court's determination of the total award to Jeffry utilized the correct amount awarded to Jeffry under section J and the court's totals listed in the table reflect the proper amount awarded under the decree, we find no error in the court's final calculation. Additionally, because we previously rejected Jeffry's claims regarding error by the district court in its classification and/or valuation of marital assets and debts, we find no error in the court's calculation of the equalization payment. This claim fails.

### (d) Conditional Judgment

Jeffry's final assignment of error is that the portion of the court's order contained in "Exhibit E," dividing his unvested military credits on a conditional basis, was a conditional judgment where the rights of the parties could not be determined with reasonable certainty.

[19] Neb. Rev. Stat. § 25-1301 (Cum. Supp. 2022) defines a judgment as "the final determination of the rights of the parties in an action." The Nebraska Supreme Court stated in *Strunk v. Chromy-Strunk*, 270 Neb. 917, 929-30, 708 N.W.2d 821, 834 (2006):

We have elaborated that a "judgment" is a court's final consideration and determination of the respective rights and obligations of the parties to an action as those rights and obligations presently exist. *Village of Orleans v. Dietz*, 248 Neb. 806, 539 N.W.2d 440 (1995). Thus, we have held that orders purporting to be final judgments, but that are dependent upon the occurrence of uncertain future events, do not operate as "judgments" and are wholly ineffective and void as such. See *Kroll v. Department of Motor Vehicles*, 256 Neb. 548, 590 N.W.2d 861 (1999). These "conditional judgments" are not final determinations of the rights and obligations of

the parties as they presently exist, but, rather, look to the future in an attempt to judge the unknown. *Village of Orleans v. Dietz, supra.* We have held that a conditional judgment is wholly void because it does not "perform in praesenti" and leaves to speculation and conjecture what its final effect may be. *Id.*

[20-22] However, as it related to actions in equity, the Nebraska Supreme Court further elaborated in *Strunk*:

We now expressly hold that the void conditional judgment rule does not extend to actions in equity or to equitable relief granted within an action at law. Rather, where it is necessary and equitable to do so, a court of equitable jurisdiction may enter a conditional judgment and such judgment will not be deemed void simply by virtue of its conditional nature. Conditional judgments are a fundamental tool with which courts sitting in equity have traditionally been privileged in order to properly devise a remedy to meet the situation. We will not take away that tool by extending our void conditional judgment rule into the realm of equity. Rather, we follow the numerous decisions from other jurisdictions, set forth above, and precedent by this court that recognizes that a strict prohibition against conditional judgments is inappropriate to equitable relief.

. . . We note, however, that simply because a conditional judgment in an action at equity is not automatically void, it does not follow that all conditional judgments are acceptable on direct review or that judgments in equity cannot, for different reasons, be void and therefore subject to collateral attack. Certain conditional judgments may still be considered erroneous or an abuse of discretion, be set aside where procured by fraud, or be considered void as contrary to statute or public policy.

Perhaps most relevant, conditional judgments in equity are required to determine the rights and obligations of the parties with reasonable certainty.

270 Neb. at 934-35, 708 N.W.2d at 837.

Here, after hearing evidence related to the division of military benefits, the district court found Jeffry had served in the U.S. Navy for more than 10 years, overlapping 10 years of marriage, and that the credits that Jeffry earned during his service were marital assets that were subject to division by the court. Further, having noted that Jeffry separated from active-duty service on September 30, 2021, prior to serving 20 years in the Navy, the Court stated:

> Should [Jeffry] re-enter active duty military service at any time during his lifetime, he shall promptly notify [Megan] of his re-entry. Should [Jeffry] complete a total of twenty (20) or more years of military service, [Megan] will be awarded a portion of [Jeffry's] military retired pay, as described in this section, and with the following factual findings, legal conclusions, and information necessary for [Defense Finance and Accounting Service] to effectuate this award.

(Emphasis omitted.)

Jeffry argues that the portion of the district court's order related to his military credits is a void conditional judgment, because it does not determine his rights and obligations with reasonable certainty. More specifically, he argues that because his military retirement benefits were unvested, any order would not be recognized by the Defense Finance and Accounting Service because there were no benefits to divide. Additionally, he argues that the order contains a hypothetical division of an unvested asset that may never vest, and it fails to address how Megan should buy in if the credits are converted. Jeffry argues that because the district court is unable to predict the legal landscape at the time of any hypothetical future employment, and there are no actual benefits to divide, the court had no ability to ascertain his rights and obligations under the decree.

[23] Insofar as his argument relates to the fact that his benefits are unvested, that argument fails. In Nebraska, marital assets are subject to equitable division in a dissolution

proceeding and retirement benefits, "whether vested or not vested," are eligible for inclusion in the marital estate under Neb. Rev. Stat. § 42-366(8) (Reissue 2016). *Weiland v. Weiland*, 307 Neb. 882, 951 N.W.2d 519 (2020).

As it relates to the certainty of the rights and obligations, the court's order requires that should Jeffry reenter the military or become employed in the federal sector, convert his credits, and complete 20 years of service, he is required to notify Megan and she will be awarded a portion of the retirement benefit. More specifically, the district court order awarded Megan 50 percent of the disposable military retired pay Jeffry "would have received had he retired with a retired base (High-3) of $7,630 per month, and with 12.75 years of credi[ta]ble service on July 31, 2021. This award shall include [50 percent] of all future cost-of-living adjustments ('COLA's')." (Emphasis omitted.) Neither party disputes that the district court's order is conditioned on whether or not Jeffry either reenters the military or obtains employment in the federal sector and converts his time-served credits to the federal retirement plan. Because the void conditional judgment rule does not apply in cases of equity, we cannot find that the conditional nature of the order alone renders the judgment void.

However, since certain conditional judgments may still be considered erroneous or an abuse of discretion, be set aside where procured by fraud, or be considered void as contrary to statute or public policy, we consider whether the judgment is void due to the order not determining the rights and obligations of the parties with reasonable certainty as alleged by Jeffry. See *Strunk v. Chromy-Strunk*, 270 Neb. 917, 708 N.W.2d 821 (2006). We find that it is not.

[24] In *Longo v. Longo*, 266 Neb. 171, 663 N.W.2d 604 (2003), the Nebraska Supreme Court analyzed Nebraska law in relation to a conditional award of future military pension benefits that had not vested. In connection therewith, the appellant argued that, because there was no guarantee of receiving a future pension benefit, the appellant had

no ownership interest under § 42-366(8). In finding that the argument ran contrary to its prior decisions involving the treatment of military benefits in dissolution proceedings, the Nebraska Supreme Court upheld the conditional award, citing *Ray v. Ray*, 222 Neb. 324, 383 N.W.2d 752 (1986), and ultimately held:

> We agree with Justice Brodkey's observation that § 42-366(8) logically requires that a nonvested military pension be treated as marital property in a dissolution proceeding. While military personnel do not make monetary investments in a pension plan, they invest time and personal sacrifice in order to qualify for a nondisability military pension. Spouses of such personnel share in this investment to the extent that the duration of the marriage coincides with the period of military service. As one court has noted, the future retirement pay of a career military service member who is not yet eligible to retire "is a contractual right, subject to a contingency, and is a form of property." *Jackson v. Jackson*, 656 So. 2d 875, 877 (Ala. Civ. App. 1995). Because § 42-366(8) specifically requires the inclusion of retirement benefits "whether vested or not vested" in the marital estate, we conclude that the district court did not err in awarding [appellee] a share of [appellant's] future nondisability military pension entitlement, payable only if and when such benefits become payable to [appellant].

*Longo v. Longo*, 266 Neb. at 179, 663 N.W.2d at 610.

But Jeffry also assigns and argues that the conditional aspect of the order here should be set aside on a separate basis. That is, he argues that the part of the court's order awarding a portion of the pension benefit to Megan does not determine the rights and obligations of the parties with reasonable certainty.

In relation to the conditional aspect of the order governing Jeffry's pension, the court fashioned language that dealt with both disposable military retired pay should Jeffry reenter

(which we will refer to as his "Military Retirement Pension") and potential retirement pay in any other government system that would give Jeffry credit for the time he served while in the military (which we will refer to as his "Civil Service Retirement Benefit").

As to the former, the language of the order awarding Megan 50 percent of the disposable military retired pay that Jeffry "would have received had he retired with a retired base (High-3) of $7,630 per month, and with 12.75 years of credi[ta]ble service on July 31, 2021," (emphasis omitted), complies with the Nebraska Supreme Court's directives in *Weiland v. Weiland*, 307 Neb. 882, 951 N.W.2d 519 (2020). In *Weiland*, after reviewing applicable Department of Defense regulations that provide guidance for district courts to create a hypothetical retired pay amount, in relation to a district court's order awarding pension benefits, the Nebraska Supreme Court held:

> We reverse and vacate the district court's order and remand the matter with directions to value [the husband's] hypothetical retired base pay, to be determined based on the average basic pay for the most recent 36 months (known as high-3) prior to the hypothetical retirement date of September 30, 1996. Applicable Department of Defense regulations provide guidance for the district court to create a hypothetical retired pay formula based on the relevant facts. To enable the Defense Finance and Accounting Service to calculate the hypothetical retired pay amount, the clarifying court order must provide the following: (1) the percentage the former spouse was awarded; (2) the hypothetical years of creditable service, or, in the case of a reservist, the Reserve retirement points on which the hypothetical retired pay is to be based; (3) the hypothetical retired pay base; and (4) the hypothetical retirement date. See DoD FMR 7000.14-R, vol. 7B, ch. 29, ¶ 290608(F). The decree should be clarified to reflect that [the wife] is awarded 50 percent of

the disposable military retired pay [the husband] would
have received had he become eligible to receive mili-
tary retired pay with a "retired pay base (high-3) of [$]"
and with 3,334 Reserve retirement points on September
30, 1996. See DoD FMR 7000.14-R, vol. 7B, ch. 29,
figure 29-1.

307 Neb. at 891-92, 951 N.W.2d at 526.

In summary, as for the Military Retirement Pension, which
is addressed in the dissolution decree's attached "Exhibit E"
through paragraph xvi, we find no abuse of discretion and
affirm that portion of "Exhibit E."

That said, in his brief, Jeffry appears to take greater excep-
tion to the language of the order governing the hypothetical
Civil Service Retirement Benefit. In doing so, he argues:

Astley also specifically testified about how his proposed
language in subparagraph xvii . . . is based on hypotheti-
cal scenarios that the Court must address in its order. . . .
He testified that the Court needed to determine the fair
and equitable manner to account for a future buy-in to the
Federal Employee Retirement System (FERS) program in
the event[Jeffry] became employed by the government as
a civil service employee. . . . Specifically, should [Jeffry]
become a federal employee, he may be entitled to "buy-
out" any past military credits and apply [them] towards
FERS retirement. This is based on a percentage of total
earnings. This would be an additional up[-]front cost just
to [Jeffry] if this extended series of variables were to
come to fruition.

. . . .

The problem with these hypotheticals is that the ben-
efits and their calculation are impossible to determine
based on the record. . . . Astley admitted that [Jeffry's]
possible benefits could vest on entirely different sched-
ules depending on whether he was active[-]duty military
or whether he converted his military credits to a FERS
benefit. . . . Astley acknowledged that the intent of the

proposed language (which was adopted [by the district court]) was to divide "credits," that's what he defined as the asset. . . . Yet . . . Astley specifically testified that he had no way to quantify or value those credits because "I don't know under what conditions they would vest if at all."

Brief for appellant at 21-22.

We agree with Jeffry's argument related to his potential Civil Service Retirement Benefit. Because this record is devoid of the future eventualities associated with civil service employment that could shape a future benefit award, we agree that the language related to the Civil Service Retirement Benefit found in paragraph xvii of the district court's order does not comply with the requirement that the provision must articulate the rights and obligations of the parties with reasonable certainty and is therefore vacated. As Astley acknowledged during his testimony, there are simply too many variables associated with Jeffry's possible civil service employment to capture in the form of an award, and those differing options are certainly not contained within this record. Instead, it was clear that the court wanted to make sure the order captured that Megan would be entitled to an award relating to any future FERS program where Jeffry obtained benefits from his prior military service that occurred while Jeffry was married to Megan. In that regard, the court should simply have ordered the following:

> The husband shall promptly notify the wife if he obtains employment with any governmental branch or agency that will permit him to obtain any credit toward any other government retirement system in combination with the time or credits he earned while in the military. In that event, the wife shall be entitled to 50 percent of the value for the 12 years and 9 months of creditable service that the husband earned during the parties' marriage and the court retains jurisdiction to amend the decree to

issue such supplemental orders as may be required to effectuate this award.

In summary, we vacate paragraph xvii contained within "Exhibit E" attached to the dissolution decree and remand the matter with directions to replace paragraph xvii as set forth above.

## 2. Megan's Cross-Appeal

In her cross-appeal, Megan contends that the district court abused its discretion in awarding the parties joint legal and physical custody, awarding alimony of $250 per month for 60 months, and including $3,000 in Jeffry's attorney fees in its division of the parties' marital estate.

### (a) Custody

Megan contends that the district court erred in awarding the parties joint legal and physical custody. She points to Jeffry's behavior toward her and one of the children who found an unattended loaded gun while in Jeffry's care as factors weighing against joint legal and physical custody and in favor of awarding her sole legal and physical custody.

[25,26] When custody of minor children is an issue in a proceeding to dissolve the marriage of the children's parents, custody is determined by parental fitness and the children's best interests. *Burcham v. Burcham*, 24 Neb. App. 323, 886 N.W.2d 536 (2016). When both parents are found to be fit, the inquiry for the court is the best interests of the children. *Id.*

[27,28] When determining the best interests of the child in deciding custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *State on behalf of Kaaden S. v. Jeffery T.*, 303 Neb. 933, 932 N.W.2d 692

(2019); *Bryant v. Bryant*, 28 Neb. App. 362, 943 N.W.2d 742 (2020). The Parenting Act also provides that the best interests of a child require a parenting plan that provides for a child's safety, emotional growth, health, stability, physical care, and regular school attendance, and which promotes a child's continued contact with his or her families and parents who have shown the ability to act in the child's best interests. *Bryant v. Bryant, supra*.

Here, the district court found that both parties were fit and proper persons to have custody of their minor children and awarded them joint legal and physical custody. During the dissolution hearing, both children testified that they had the same general routine at both parents' homes, that they had good relationships with both parents, and that they wanted to spend equal amounts of time with them. The evidence supported that both Jeffry and Megan provide for their children's safety, emotional well-being, physical and emotional care, and educational needs. Although one of the children located a loaded firearm at Jeffry's residence, neither party disputed that the child did not touch the firearm and that Jeffry immediately placed the firearm away from the children. Neither child reported seeing a firearm after this one occasion. Based on our de novo review, we find that the district court did not abuse its discretion in awarding the parties joint legal and physical custody of their minor children. This assignment fails.

### (b) Alimony

Megan next asserts that the district court erred in awarding her insufficient alimony of $250 per month for 60 months. She argues that an award of $600 per month for a total of 60 months is more appropriate, considering the parties' significant income disparity, the disruptions to her career, and her contributions to the marriage.

[29-32] In *Wiedel v. Wiedel*, 300 Neb. 13, 20-21, 911 N.W.2d 582, 588-89 (2018), the Nebraska Supreme Court stated:

In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party. In addition, a court should consider the income and earning capacity of each party and the general equities of the situation.

The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances make it appropriate. In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. The ultimate criterion is one of reasonableness. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.

Here, the district court awarded Megan alimony in the amount of $250 per month for 60 months, finding that

Jeffry has significantly higher earnings, and he has sufficient uncommitted funds available to pay child support and alimony. Jeffry has historically through the thirteen years of their marriage supplied the majority of the financial needs of the family. There is a demonstrated need of Megan for support, and ability of Jeffry to meet that need. Megan has what appears to be a stable job in the teaching profession which affords health insurance benefits. She also has disability income through the VA which she expects will be in the amount of $758.28 following the decree. Unless Megan acquires further education, her future earning capacity will be limited.

Based on our de novo review, we cannot find that the district court abused its discretion in the amount of the alimony award. At the time of the dissolution proceedings, the parties had been married for 13 years. Shortly after the parties married, Jeffry entered the Navy and the parties frequently moved to accommodate Jeffry's military career. Jeffry was the primary financial support for the family. Jeffry separated from the Navy in September 2021, and since then, he obtained two jobs earning a total amount of $183,000 per year. Evidence at trial established that after the parties agreed that Megan and the children would relocate to Nebraska, Jeffry sent $3,500 in monthly support to Megan to cover living expenses.

During the parties' marriage, from 2009 to 2014, Megan was a stay-at-home mother while simultaneously attending school to obtain a teaching degree. After 2014, Megan began to teach at various schools at the locations where Jeffry was stationed. Then, after Megan and the children moved to Nebraska to help care for Megan's father, she began teaching, earning $63,000 per year. Additionally, she was receiving her VA disability at 40 percent, which she testified would decrease after the divorce to $758.28.

The district court found that an award of alimony was proper, and the court's order makes clear that it considered the parties' income disparity, the contributions of each party to the marriage, and the primary financial support provided by Jeffry for the family during the marriage, as well as Megan's demonstrated need for support. Although Megan argues that she should be awarded more because of the disruptions in her career due to the frequent moves to accommodate Jeffry's career, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. See *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). Based on the record before us, we cannot say that the amount

awarded was unreasonable or patently unfair. This assignment fails.

### (c) Classifying Attorney
### Fees as Marital Debt

Megan's final assignment of error is that the district court erred in including the full amount of Jeffry's USAA credit card of $13,190.58 as marital debt because the evidence at trial established that Jeffry had paid $3,000 of his attorney fees with the card.

Here, although both parties requested attorney fees in their pleadings, the district court did not award attorney fees and stated that "[a]ll other relief prayed for by either party, not otherwise specifically addressed in this decree, is denied." Accordingly, each party was to pay his or her own attorney fees, and the issue is whether the entire amount of Jeffry's credit card should be considered marital debt, despite Jeffry's testimony that he paid $3,000 of his attorney fees on that credit card.

[33] "'[M]arital debt includes only those obligations incurred during the marriage for the joint benefit of the parties.'" *Vanderveer v. Vanderveer*, 310 Neb. 196, 210, 964 N.W.2d 694, 706 (2021).

It is undisputed that $3,000 of Jeffry's attorney fees were paid by Jeffry on the credit card on February 25, 2020, and the court included the entirety of the credit card balance as marital debt. Because the court explicitly determined it would not require either party to pay the other party's attorney fees, we find that the district court erred in including the entire balance of the credit card as marital debt in its calculation, because this expense was not incurred for the joint benefit of the parties. Accordingly, we reduce the total amount of Jeffry's credit card debt as listed in Section J from $13,190.58 to $10,190.58 and modify the district court's award as follows (see bold text below):

|            | Jeffry          | Megan         |
|------------|-----------------|---------------|
| Section A: | $2,270.00       | $5,645.00     |
| Section B: | $18,781.85      | $3,976.00     |
| Section C: | $9,000.00       | [$2,267.00]   |
| Section E: | $57,957.00      | $46,786.66    |
| Section F: | $75,148.35      | $14,565.65    |
| Section J: | **[$10,190.58]**| [$38,436.00]  |
| Totals     | **$152,966.62** | $30,269.66    |

With this modification, Jeffry's total portion of the marital estate is $152,966.62 and Megan's total portion of the marital estate is $30,269.66. Accordingly, we increase the amount of the equalization payment that Jeffry is to make to Megan to $61,348.48.

## VI. CONCLUSION

For the reasons stated above, we affirm in part and affirm in part as modified the district court's order, but reverse and vacate paragraph xvii of "Exhibit E" and remand the matter with directions to replace paragraph xvii with the following language:

> The husband shall promptly notify the wife if he obtains employment with any governmental branch or agency that will permit him to obtain any credit toward any other government retirement system in combination with the time or credits he earned while in the military. In that event, the wife shall be entitled to 50 percent of the value for the 12 years and 9 months of creditable service that the husband earned during the parties' marriage, and the court retains jurisdiction to amend the decree to issue such supplemental orders as may be required to effectuate this award.

Affirmed in part, affirmed in part as modified, vacated in part, and in part reversed and remanded with directions.